**UNITED STATES of America, Plaintiff–Appellee,**

v.

**Thomas S. ORR, Defendant–Appellant.**

No. 94–6328.

United States Court of Appeals, Tenth Circuit.

Oct. 23, 1995.

Michael G. Katz, Federal Public Defender, and Jenine Jensen, Assistant Federal Public Defender, Denver, Colorado, for Defendant–Appellant.

Rozia McKinney–Foster, United States Attorney, William Lee Borden, Jr. and Debra Woods Paull, Assistant United States Attorneys, Oklahoma City, Oklahoma, for Plaintiff–Appellee.

Before TACHA, LOGAN and KELLY, Circuit Judges.

LOGAN, Circuit Judge.

Defendant Thomas S. Orr appeals from his conviction after a jury trial for bank fraud in violation of 18 U.S.C. § 1344(1) and § 2(b). The district court sentenced him to thirty-three months imprisonment and three years of supervised release. Defendant argues that the district court (1) created the appearance of partiality toward the government by questioning government witnesses; (2) allowed the government's expert witness to testify that defendant had the necessary mental state to satisfy the intent element of bank fraud, in violation of Rule 704(b) of the Federal Rules of Evidence; (3) applied U.S.S.G. § 2F1.1 in effect at the time of sentencing, which violated his rights under the Ex Post Facto Clause of the United States Constitution; and (4) erroneously enhanced defendant's sentence for more than minimal planning.[1]

## I

The indictment charged defendant, president of Service Stores of America, Inc. (Service Stores), with defrauding First Interstate Bank of Oklahoma (First Interstate). The government alleged that defendant used a check kiting scheme to artificially inflate Service Stores' account balances at First Interstate.

Service Stores owned convenience stores in three states; those stores made daily deposits into local banks. Service Stores then made daily deposits from those out-of-state accounts to its concentration account with First Interstate. Defendant controlled the cash flow of Service Stores: every morning he checked the amounts deposited in the out-of-state accounts and instructed his employees to prepare checks[2] in specified amounts drawn on the out-of-state accounts. Defendant signed the checks which were then deposited into the First Interstate concentration account. When defendant was out of the office he determined the amounts to be deposited and had another employee sign the checks.

In August and September 1989 First Interstate became aware that some of the out-of-state Service Stores checks that were deposited into the concentration account were being returned for insufficient funds (bouncing). When checks were deposited in the concentration account, however, the bank did not know whether they were insufficient or not. By the time an insufficient check floated from First Interstate to the out-of-state bank it was drawn upon and back to First Interstate (which was sometimes done twice), more deposits, some of which included insufficient funds checks, had been made into the concentration account so that a positive balance always remained when the returned checks were deducted against Service Stores' ledger balance.

In September 1989 the account manager at First Interstate decided not to return Service Stores checks a second time for payment. He placed a seven-day hold on all deposited checks to insure that they were sufficient before those funds were available to cover drafts against their payroll, general bills and store merchandise accounts.[3] When all of the insufficient funds checks "floated" back, the concentration account showed a loss of $242,000. This activity was the basis for the charge on which defendant was convicted.

---

1. After examining the briefs and appellate record, this panel has determined unanimously to honor the parties' request for a decision on the briefs without oral argument. *See* Fed.R.App.P. 34(f); 10th Cir.R. 34.1.9. The case is therefore ordered submitted without oral argument.

2. Although Service Stores purchased an automated clearing house program (ACH) that could electronically transfer funds from its out-of-state bank accounts into the concentration account, it did not use the ACH. The ACH would decrease the amount of "float time" for checks. Float time is the time that it takes for a check to work

its way back between banks through the Federal Reserve system. In 1989, the float time for insufficient funds out-of-state checks was approximately six to eight days.

3. Service Stores had three zero balance accounts at First Interstate for payroll, general bills and store merchandise. These accounts carried a zero balance; when checks were drawn against them, funds were transferred automatically by computer from the concentration account into these accounts to cover the negative balance created by those drafts.

## II

Defendant first asserts that the district court created the appearance of partiality by questioning government witnesses in the presence of jurors. He contends that the judge examined three witnesses on behalf of the prosecution and that this denied him a fair trial. *See United States v. Bland,* 697 F.2d 262, 264–66 (8th Cir.1983) (judge's questioning constituted reversible error because court essentially took over the cross-examination for the government). Because defendant failed to object to any of the questioning at trial, we review this issue only for plain error. *United States v. Latimer,* 548 F.2d 311, 315 (10th Cir.1977).

■ As defendant acknowledges, judges may question witnesses called by the parties. Fed.R.Evid. 614(b). A judge may ask questions to clarify important points and to ascertain facts, but may not become an advocate for either party. *Latimer,* 548 F.2d at 314; *United States v. Wheeler,* 444 F.2d 385, 390 (10th Cir.1971). Interrogation of witnesses by a judge in a criminal case creates a unique risk that the judge will be perceived as an advocate. *See United States v. Ball,* 428 F.2d 26, 30 (6th Cir.), *cert. dismissed,* 400 U.S. 801, 91 S.Ct. 7, 27 L.Ed.2d 33 (1970). We review the questioning of each of these witnesses under these standards.

First, during the government's redirect examination of its rebuttal witness Jeffrey Keller, a former employee of the Friendly Bank, the court asked Keller if he had told defendant that Friendly Bank found Service Stores' account undesirable because of a high volume of activity and small checks to vendors. Keller responded that he had not. Defendant had testified that this was one of the reasons Friendly Bank asked Service Stores to move its account. Defendant asserts the question effectively impeached his testimony and was improper. *See United States v. Manko,* 979 F.2d 900, 906 (2d Cir.

1992) ("Impeaching the defendant is the job of the prosecution, not the court."), *cert. denied,* —— U.S. ——, 113 S.Ct. 2993, 125 L.Ed.2d 687 (1993). The government asserts, however, that a potentially important issue in the trial was whether, while defendant was in charge of daily operations, Service Stores incurred overdrafts at other banks before moving its accounts to First Interstate.[4] The testimony up to that point did not unambiguously establish whether Friendly Bank closed Service Stores' account because of overdrafts, because of the volume of checks, or both. Thus the judge's question was aimed at clarifying why the Service Stores account at Friendly Bank was closed, and did not show partiality.

Defendant asserts that the court's questioning of the government's expert witness John Woody created the appearance of partiality to the government. The court engaged in the following questions:

> THE COURT: ... did [Service Stores] have sufficient positive cash flow so as to permit a reduction of its debt to First Interstate on some kind of organized workout?
>
> THE WITNESS: No, sir, they did not....
>
> THE COURT: Now, assuming your opinion is correct, as I'm sure you're willing to do, anyway, is the scheme that you identified here one that is likely to have any success over a long period of time?
>
> THE WITNESS: ... the only way out of this problem, out of this hole, is for the business to, one, keep growing and grow and prosper.... The only other way out is to keep finding a bank sucker. They found one at Mid South. They found one at Friendly for a while, and I know those people and they're tough. And they found one at First Interstate and they made a mistake. They got in trouble at Edmond,

---

4. There was an overdraft at Mid–South National Bank in Lafayette (Louisiana) of approximately $180,000 to $200,000, incurred before defendant took over responsibility for daily operations. Service Stores borrowed money from Mid–South Bank to reduce a portion of the overdraft in Service Stores' account at that bank, but the overdraft problem continued and grew to $173,-

990 by July 19, 1989. Mid–South Bank asked Service Stores to bank elsewhere; Service Stores moved the account to Friendly Bank in Oklahoma City. Friendly Bank also asked Service Stores to close its account after it experienced overdraft problems. Service Stores then moved the account to First Interstate.

I know that bank too, and when they started their shenanigans up there, Edmond cut them off.

V R. 428–29. As the government points out, testimony elicited from Woody and other witnesses was equivocal concerning whether the overdrafts at issue could be the result of acceptable business practices or whether they were illegal. The judge's questioning of Woody thus served to clarify whether the First Interstate overdrafts were similar to prior overdrafts that were caused by circumstances beyond defendant's control.

Finally, defendant contends that the district court's questioning of First Interstate's vice president Donald Schnoor presented an appearance of partiality to the government.

THE COURT: Let me clarify this, Mr. Schnoor. Let's say Service Stores of America's main office here in Oklahoma City has on the desk there a checkbook against the Alvin State Bank checks. And it's got an ACH [automated clearing house] program in its computer. If it elects to transfer the funds by using the check book, the first communication then is sending that check to First Interstate; would that be correct?

THE WITNESS: Correct.

THE COURT: If it uses the ACH, the first communication through the computer would be to the bank at Alvin rather than First Interstate; would that be correct?

THE WITNESS: That would be incorrect, Your Honor.

THE COURT: All right. How does it work then, what's the first communication?

THE WITNESS: The company would build a data base and that data base would list each of those stores that they had and each record would be a routing number and an account number, the same information that would be on a check. When they create a report for a withdrawal, they would data transmit that file to the bank, making an electronic deposit versus a check deposit.

THE COURT: Yeah, which bank?

THE WITNESS: Our bank. Then we would look at that transaction and forward it through the Federal Reserve Bank, eventually winding up at the bank in Alvin or their data processor, which is really in a same sense the way the check would flow.

THE COURT: So in either event, the communication goes from Service Stores to your bank, and then back through the federal system to the Alvin Bank?

THE WITNESS: Correct. What they report today happens tomorrow in ACH.

IV R. 249–50. Defendant asserts that this exchange indicated that the checks would have traveled more quickly if Service Stores had used the ACH system and improperly reemphasized testimony suggesting that Service Stores did not use the ACH system because it would have prevented the scheme to defraud by transferring funds so rapidly.

This exchange may have implied that the ACH transferred funds quickly, but the district court did not question the witness about the speed of deposits. Rather, the questions focused on whether the information for both the ACH and the paper check method flowed in the same direction, *i.e.,* from the local banks to First Interstate. Viewed from a prospective analysis, *see United States v. Norris,* 873 F.2d 1519, 1526 (D.C.Cir.), *cert. denied,* 493 U.S. 835, 110 S.Ct. 113, 107 L.Ed.2d 75 (1989), these questions are attempts to clarify the somewhat complex testimony about how the bank transactions were structured.[5]

■ Taken together, the responses to the court's questioning may have negatively affected defendant's defense that he was acting in good faith without any specific intent to defraud. But the district court may ask questions in "the search for truth," *United States v. Cheatwood,* 575 F.2d 821, 826 (10th Cir.), *cert. denied,* 439 U.S. 853, 99 S.Ct. 162, 58 L.Ed.2d 158 (1978), and "it is no ground of complaint that the facts so developed may hurt or help one side or the other." *United States v. Jones,* 730 F.2d 593, 598 (10th Cir. 1984) (quotations and citations omitted). In the context of this somewhat complicated

---

**5.** In his brief defendant complains of additional questioning by the court outside the presence of the jury. As such questions could not have influenced the jury we do not address them.

trial, the court's brief questioning of three witnesses did not create an appearance of partiality toward the government.

██ Defendant also asserts that the court erred in failing to instruct the jury concerning the significance of his questioning of witnesses. Defendant failed to object to the jury instructions at trial, however, and the need to give such an instruction sua sponte is not so obvious as to constitute plain error. *See United States v. Simmonds,* 931 F.2d 685, 687 (10th Cir.), *cert. denied,* 502 U.S. 840, 112 S.Ct. 129, 116 L.Ed.2d 97 (1991).

## III

Defendant argues that testimony by the government's expert witness John Woody specifically addressed defendant's intent to commit bank fraud and thus violated Fed. R.Evid. 704(b). *See United States v. Cox,* 826 F.2d 1518, 1524 (6th Cir.1987), *cert. denied,* 484 U.S. 1028, 108 S.Ct. 756, 98 L.Ed.2d 768 (1988). The defense attorney did not object at trial to the admission of this testimony; therefore, we review only for plain error. *United States v. Austin,* 981 F.2d 1163, 1164 (10th Cir.1992), *cert. denied,* —— U.S. ——, 113 S.Ct. 1859, 123 L.Ed.2d 481 (1993).

██ Rule 704(b) does not prohibit an expert witness from stating his opinion and reviewing facts from which a jury could determine whether a defendant had the requisite criminal intent. *See United States v. Richard,* 969 F.2d 849, 854–55 (10th Cir.), *cert. denied,* —— U.S. ——, 113 S.Ct. 248, 121 L.Ed.2d 181 (1992), *cert. denied,* —— U.S.——, 113 S.Ct. 1009, 122 L.Ed.2d 157 (1993). Rather, the rule prohibits an expert witness from testifying that a defendant did or did not possess the requisite mental intent at the time of the crime, *Austin,* 981 F.2d at 1165; *Richard,* 969 F.2d at 855. Woody testified that in his opinion the Service Stores' scheme would succeed only if the business were very successful or if it continued to find "a bank sucker," V R. 429. Although the jury could have inferred defendant's criminal intent from these statements, Woody did *not* testify that defendant had the requisite criminal intent for fraud. Admit-

ting Woody's testimony was not error under Rule 704(b).

## IV

### A

██ We next address defendant's assertions of sentencing errors. Defendant argues that his sentence violated his rights under the Ex Post Facto Clause. Although defense counsel did not present this issue at sentencing, ex post facto application of a sentencing guideline to the disadvantage of a defendant is plain error. *United States v. Gerber,* 24 F.3d 93, 95–96 (10th Cir.1994).

██ The sentencing court generally must apply the sentencing guidelines in effect on the date of sentencing rather than those in effect at the time of the offense. The Ex Post Facto Clause, however, prohibits retroactive application of an amended guideline provision if the amendment "disadvantages the defendant." *Id.* (quoting *United States v. Saucedo,* 950 F.2d 1508, 1513 (10th Cir. 1991)).

The district court applied the 1993 guidelines in effect at the time of sentencing. U.S.S.G. § 2F1.1 sets the base offense level for fraud at six, and provides for an increase in the offense level based on the amount of loss caused by the fraud. The district court determined that the amount of loss was $196,500, which increased the offense level by *seven. Id.* Over defense objections two levels each were added for obstruction of justice (perjury) and more than minimal planning. This resulted in a total offense level of seventeen and a sentencing range of twenty-seven to thirty-three months based on a criminal history category of II. The district court sentenced defendant to thirty-three months incarceration. The 1988 guidelines that were in effect when defendant committed the offense, however, provided for an offense level increase of only *six* for a $196,500 loss, U.S.S.G. § 2F1.1(b)(1)(G) (June 15, 1988), which would result in a total offense level of sixteen and a sentencing range of twenty-four to thirty months.

██ The government concedes that the district court's retroactive application of the

revised guideline disadvantaged defendant and thus violated the Ex Post Facto Clause. This was plain error and requires us to remand for resentencing under the guidelines in effect at the time of the offense.

### B

 Finally, defendant asserts that the district court erred when it enhanced his sentence by two points for "more than minimal planning" as defined by U.S.S.G. § 1B1.1. This is a factual determination that we review under a clear error standard. *United States v. Yost*, 24 F.3d 99, 105 (10th Cir.1994).

The relevant sentencing guideline provides that

"More than minimal planning" means *more planning than is typical for commission of the offense in a simple form.* "More than minimal planning" also exists if significant affirmative steps were taken to conceal the offense....

"More than minimal planning" is deemed present in any case involving *repeated acts over a period of time,* unless it is clear that each instance was purely opportune....

U.S.S.G. § 1B1.1, comment. (n. 1(f)) (emphasis added).

Defendant objected to the presentence report statement that the offense involved repeated acts over a period of time. The district court overruled defendant's objection, finding in part that the plan "certainly represented more than minimal planning because of the time period over which it extended and because of the care of which it was executed." I R. doc. 131.

 Defendant points out that by its very nature a check kiting scheme cannot be completed with a single check and thus repeated acts are required to commit fraud by check kiting. He then asserts that the "repeated acts" basis for the more than minimal planning enhancement can never be applied to a check kiting scheme. This argument is specious. The scheme involved extensive recordkeeping by defendant and deposits of 298 insufficient fund checks from the out-of-state banks over a period of more than a month. The two-point enhancement for

more than minimal planning was not clear error. *See United States v. Mau,* 45 F.3d 212 (7th Cir.1995); *see also United States v. Lee,* 973 F.2d 832, 833 (10th Cir.1992) (upholding more than minimal planning when bank employee on six occasions deposited a customer's funds into her own or a son's account).

We AFFIRM the decision of the district court in all respects except for the sentencing of defendant to three months more than allowed under the guidelines at the time he committed the acts. We REMAND for resentencing.