**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**MAR 23 1999**

**PATRICK FISHER**
**Clerk**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

v.

BOBBY O'NEAL NEGRI, JR.,

Defendants-Appellant.

No. 98-6178
(W. Dist. of Oklahoma )
(D.C. No. 97-CR-208)

**ORDER AND JUDGMENT**[*]

Before **ANDERSON**, **KELLY**, and **MURPHY**, Circuit Judges.

**INTRODUCTION**

A federal grand jury handed down a three-count indictment charging Bobby

Negri with stealing approximately $2.6 million from a Loomis/Fargo Armored

Carriers ("Loomis") armored car. In particular, the indictment alleged that Negri

conspired to steal the money and transport it in interstate commerce in violation

---

[*]This order and judgment is not binding precedent, except under the doctrines of law of the case, res judicata and collateral estoppel. The court generally disfavors the citation of orders and judgments; nevertheless, an order and judgment may be cited under the terms and conditions of 10th Cir. R. 36.3.

of 18 U.S.C. § 371; stole money belonging to the Oklahoma City, Oklahoma, Federal Reserve Bank in violation of 18 U.S.C. § 2113(b); and transported the stolen money in interstate commerce in violation of 18 U.S.C. § 2314.

Negri entered a plea of guilty to all three counts of the indictment. Pursuant to the sentencing calculations set out in the Presentence Report ("PSR"), the district court sentenced Negri to a term of imprisonment of sixty months on count one, sixty-three months on count two, and sixty-three months on count three, all to run concurrently with one another. Negri appeals the sentence imposed, contending the district court erred in the following particulars: (1) increasing Negri's base offense level by two points pursuant to United States Sentencing Guideline ("U.S.S.G.") § 2B1.1(b)(4) because Negri engaged in "more than minimal planning"; (2) increasing Negri's base offense level by four points pursuant to U.S.S.G. § 2B1.1(b)(6)(B) because Negri derived more than $1,000,000 and the theft "affected a financial institution"; and (3) adjusting Negri's base offense level upward by two points pursuant to U.S.S.G. § 3B1.3 because Negri abused a position of "private trust." This court exercises jurisdiction pursuant to 28 U.S.C. § 1291 and 18 U.S.C. § 3742 and **affirms**.

## BACKGROUND

The facts leading up to Negri's prosecution, plea of guilty, and sentencing are as follows. On June 25, 1997, Negri arrived for work at Loomis, where he was employed as an armored car driver and guard. He was assigned that day to guard a $2.9 million shipment of Federal Reserve notes destined for various banks in Oklahoma. Usually, Loomis shipments were transported in an armored car staffed by three employees. On the night of June 24th, however, Negri spoke to one of his co-workers and learned that he was calling in sick the next day. Accordingly, Negri and co-worker Greg Stroud were alone in the armored car.

En route to their deliveries, Negri and Stroud made an unscheduled but routine stop for breakfast at a McDonald's. Stroud went into the McDonald's to buy breakfast while Negri remained in the back of the armored car, supposedly to guard the money. When Stroud returned a few minutes later, Negri and approximately $2.6 million were missing. Negri's revolver and a postcard with a handwritten note containing the following language were found in the back of the armored car: "Is Paris nice this time of year? OUI By[e] now."

Some four months after the theft, Negri and his accomplice Michael Lutz were arrested in Ft. Lauderdale, Florida. As FBI agents questioned Negri and Lutz, details of their plan began to unfold. During deliveries prior to the June 25th theft, Negri reminded bank employees that they would need extra cash on

hand for the July 4th holiday weekend and told them to "order heavy." Negri undertook these actions for the purpose of ensuring there would be plenty of money in the shipment he planned to steal. A few days prior to the theft, Negri and Lutz drove to Tulsa and left Lutz's truck at the airport. Negri and Lutz planned to leave their vehicles at different airports in the hope of confusing the police. Negri then rented a getaway van in Shawnee, where Lutz was maintaining a hotel room so he could be closer to the route of the armored car.

On the morning of the theft, Lutz drove Negri to work and parked Negri's truck at the Oklahoma City airport. Lutz then took a cab to pick up the rented getaway van, which was parked near the Loomis office. As the armored car left the Loomis office, Lutz followed. When the armored car stopped at the McDonald's, Lutz pulled into the parking lot. When Stroud went inside, Negri and Lutz quickly unloaded the bags of money into the van and fled the scene.

While Lutz drove the getaway van, Negri changed out of his guard uniform into street clothes he had previously placed in the van. The pair drove to Shawnee where they purchased another van and dumped the rented getaway van at an apartment complex. They then drove to Shreveport, Louisiana, and eventually made their way to Florida, spending money freely and changing vehicles every so often. Negri and Lutz lived on the stolen money in Florida for the next four

months, spending it on luxurious items and moving from one resort hotel to another.

## ANALYSIS

*1. U.S.S.G. § 2B1.1(b)(4)*

Sentencing Guideline § 2B1.1(b)(4) mandates a two-level upward adjustment in a defendant's base offense level for larceny, embezzlement, and other forms of theft if the offense "involved more than minimal planning." U.S. Sentencing Guidelines Manual § 2B1.1(b)(4) [hereinafter U.S.S.G.]. Under the Guidelines, "'More than minimal planning' means more planning than is typical for commission of the offense in a simple form. "More than minimal planning" also exists if significant affirmative steps were taken to conceal the offense . . . . U.S.S.G. § 1B1.1 appl'n note 1(f). The district court's conclusion that the offenses committed by Negri involved more than minimal planning is a factual determination reviewed by this court under the highly deferential clear-error standard. *See United States v. Orr*, 68 F.3d 1247, 1253 (10th Cir. 1995).

Negri argued before the district court that the § 2B1.1(b)(4) enhancement was inappropriate because of the failure of the "overall scheme," particularly the bumbling manner in which Negri and Lutz traveled from Oklahoma to Florida,

and because the measuring offense was the theft of a large sum of money from an armored car. The district court rejected these arguments, finding as follows:

> There was more than minimal planning here. The way in which this issue is stated in the guidelines is important. We're not making an inquiry as to whether there was extensive planning, we're not making an inquiry whether there was successful planning, the adjustment is applicable if you can determine what would be kind of a rock-bottom minimum, and if the government shows that something was done beyond that minimum.

In support of its finding that the offense had been accompanied by more than minimal planning, the district court made the following subsidiary factual findings. First, the district court noted that after Negri decided to commit the theft, he concluded that he needed the assistance of another. Accordingly, Negri recruited Lutz into the conspiracy. Second, the district court found that the planning for the offense extended over a period of several days. In particular, Lutz and Negri rented a van, which they intended to use as a getaway vehicle, several days before the theft. In addition, the conspirators purchased a footlocker, in which they intended to store the loot, and placed it in the rented van. Negri also stored some street clothes in the rental van so that he could immediately change out of his Loomis uniform upon completion of the theft. Third, the planning included a series of actions undertaken to cover the conspirators' tracks. In particular, Negri and Lutz formulated a plan to leave the impression that they had split up and fled the country immediately after the theft.

Several days before the theft, Lutz abandoned his vehicle at the airport in Tulsa. Furthermore, on the morning of the crime, Lutz drove Negri to work in Negri's vehicle, drove Negri's vehicle to the airport in Oklahoma City, and then took a cab back to a spot near the Loomis company to pick up the rented getaway van. In addition, upon completion of the theft, Negri left a note in the armored car leaving the impression he had gone to France. Fourth, and finally, Negri utilized inside information obtained over several days prior to the theft to maximize the chances of success and the amount of money which was likely to be on hand in the armored car. In particular, in the days before the theft, Negri told his contacts at the banks to order heavy for the Fourth of July weekend, thus ensuring that there would be plenty of money in the armored car. Negri and Lutz committed the theft on a day when one of Negri's co-workers had called in sick, so that there were only two, rather than the normal three, guards in the armored

car.[1] Furthermore, Negri stationed Lutz in the rental car on the armored vehicle's route in order to facilitate the theft.

In light of the district court's detailed subsidiary factual findings, the district court did not commit clear error in determining that the offenses at issue were accompanied by more than minimal planning. In particular, we agree that the conspirators' use of inside information and extensive planning to avoid detection after the theft is more than "is typical for commission of the offense in a simple form." U.S.S.G. § 1B1.1 appl'n note 1(f); *cf. United States v. Dougherty*, Nos. 95-6110, -6113, -6114, 1995 WL 539524, at *1 (10th Cir. Sept. 11, 1995) (unpublished disposition) (holding that use of gloves during crimes "indicates a measure of planning in the commission of the burglaries and an affirmative step to conceal the offenses"). In addition, although not specifically relied on by the district court, Negri's exhortation to Loomis customers to "order heavy" for the Fourth of July weekend and commission of the theft on the

_____

[1]During the sentencing hearing, the United States presented testimony that Negri had manipulated the third guard over several days prior to the theft to ensure that the third guard called in sick on the day of the planned theft. In response to this testimony, the district court made the following findings:

> The Court . . . is not prepared to find that the defendant actually manipulated the third guard not to come to work that day, but the success of the theft depended upon the defendant's knowledge of who was going to be there. The knowledge came to him because of his status as custodian. In putting it all together, it is not a spontaneous spur of the moment matter.

-8-

particular date upon which there might be more money than ususal in the armored

car supports the application of the enhancement.        *See* U.S.S.G. § 1B1.1 appl'

note 1(f) (providing that "obtaining information on delivery dates so that an

especially valuable item [can] be obtained . . . constitute[s] more than minimal

planning"). [2]


    2.  *U.S.S.G. § 2B1.1(b)(6)(B)*

        a.  *Standard of Review*

---

[2]Negri summarily asserts that a § 2B1.1(b)(4) enhancement is never proper unless the district court makes specific findings on the record as to what acts would be necessary in order to commit the offense in question in its most simple form and what additional acts defendant undertook in committing the offense. This argument fails for any number of reasons. In particular, Negri did not raise this argument before the district court. Instead, he simply asserted, without disputing the district court's factual findings, that his commission of the offense was too bumbling and haphazard to qualify as accompanied by even adequate planning. *See The Post Office v. Portec, Inc.* , 913 F.2d 802, 806 (10 [th] Cir. 1990) (holding that failure to raise an issue in the district court precludes any review except for the most manifest error). More importantly, however, Negri has not cited, and this court has not found, a single authority standing for the proposition that the United States must prove, and the court must find with specificity, what hypothetical acts are necessary, at a bare minimum, to commit the offenses at issue. This court rejects Negri's rigid proposed framework for analyzing § 2B1.1(b)(4) enhancements and notes, instead, that in support of the enhancement the United States must simply prove by a preponderance of the evidence that the planning present in a particular case was more than is "typical for the commission of the offense in a simple form." U.S.S.G. § 1B1.1 appl'n note 1(f). The district court's decision that the United States met its burden in this case is not clearly erroneous.

Sentencing Guideline § 2B1.1(b)(6)(B) provides for a four-point increase in a defendant's base offense level if the offense of conviction "affected a financial institution and the defendant derived more than $1,000,000 in gross receipts from the offense." U.S.S.G. § 2B1.1(b)(6)(B). Negri contends the district court erred in applying the § 2B1.1(b)(6)(B) for the following two reasons: (1) the "affected a financial institution" language of the guideline is ambiguous, rendering § 2B1.1(b)(6)(B) unconstitutionally vague; and (2) § 2B1.1(b)(6)(B) does not apply because he stole the money from an armored car rather than one of the financial institutions listed in the commentary to the Sentencing Guidelines. *See id.* appl'n note 9.

"'[T]he district court's application of the Sentencing Guidelines to the facts of a particular case is entitled to due deference and its factual findings will not be reversed unless clearly erroneous.'" *United States v. Flores-Flores*, 5 F.3d 1365, 1367 (10th Cir. 1993) (quoting *United States v. Urbanek*, 930 F.2d 1512, 1514 (10th Cir. 1991)). This court reviews the district court's legal interpretation of the Guidelines *de novo*. *Id.* Negri's vagueness challenge to § 2B1.1(b)(4) poses an ultimate question of constitutional law, to which this court applies a *de novo* standard of review. *See United States v. Wynne*, 993 F.2d 760, 764 (10th Cir. 1993).

b. *Applicability of § 2B1.1(b)(6)(B)*

-10-

Negri's challenge to the applicability of § 2B1.1(b)(6)(B) is, at the same time, both narrow and cursory.  After setting out the statutory definition of "financial institution" from 18 U.S.C. § 20 and the guideline definition of the term from the commentary to § 2B1.1, he simply notes as follows:

> Neither the statute nor the Sentencing Guideline defining "financial institution" include an armored car company within the definition.  Thus, counsel for Mr. Negri contends the theft from the Loomis/Fargo armored car should not be considered as having "affected a financial institution" and the four level enhancement was an improper application of the guideline.

This court finds Negri's argument unconvincing.  First, nothing in § 2B1.1(b)(6)(B) limits its application to thefts of money directly from a bank vault.  Instead, the guideline speaks in terms of thefts "affect[ing]" a financial institution, a term with the potential for broad application.  *See United States v. Johnson* , 130 F.3d 1352, 1354 (9 th Cir. 1997) (discussing potential breadth of word "affect").  Nevertheless, the term's potential for broad applicability exists only within a very narrow category of circumstances: the defendant must have committed a theft and "derived more than $1,000,000 in gross receipts from the offense."  U.S.S.G. § 2B1.1(b)(6)(B).  The Ninth Circuit has noted that a broad reading of "affected" furthers Congress' purpose: enhancing penalties for crimes affecting financial institutions even if the effect on the institution is attenuated. [3]

---

[3]Actually, the court in  *Johnson*  was analyzing U.S.S.G. § 2F1.1(b)(6)(B). *See United States v. Johnson* , 130 F.3d 1352, 1354 (9 th Cir. 1997).  Nevertheless,

*Id.* In this vein, the Fifth Circuit has applied U.S.S.G. § 2F1.1(b)(6), an identically worded parallel of § 2B1.1(b)(6)(B), in a case where the crime's effect on the financial institution was far more attenuated than in this case. *See United States v. Schinnell*, 80 F.3d 1064, 1069-70 (5 th Cir. 1996) (holding that wire fraud committed against business by its own employee affected a financial institution because business had contractual right to sue its bank to recover lost funds).

Ultimately, this court need not decide how broadly to read the term "affect' in § 2B1.1(b)(6)(B) because the facts of this case fall well within the heartland of the term. Count two of the indictment charged that Negri "did knowingly take and carry away with intent to steal approximately $2,632,000 in money belonging to and in the care, custody, control, management, and possession of the Federal Reserve Bank, Oklahoma City, Oklahoma, a banking institution organized and operating under the laws of the United States." Negri pleaded guilty to this count. That the money was stolen from a common carrier while in transit, rather than directly from a bank, is of no moment to the applicability of § 2B1.1(b)(6)(B). *Cf. United States v. Millar*, 79 F.3d 338, 345-46 (2 d Cir. 1996) (upholding application of § 2B1.1(b)(6)(B) to theft of funds from armored car).

---

the language of and commentary to the two provisions are identical. *Compare* U.S.S.G. § 2B1.1(b)(6)(B) *with* U.S.S.G. § 2F1.1(b)(6)(B).

Furthermore, the district court specifically found that the customer banks' balance sheets and administrative processes were negatively affected by the theft. Accordingly, the district court did not err in enhancing Negri's base offense level on the ground that his crime "affected a financial institution." U.S.S.G. § 2B1.1(b)(6)(B).

### c. Vagueness Challenge to § 2B1.1(b)(6)(B)

Negri contends the district court should have refused to apply § 2B1.1(b)(6)(B) because it is unconstitutionally vague. This court begins by noting a serious doubt as to whether a vagueness challenge can be properly lodged against the Sentencing Guidelines. *See United States v. Wivell*, 893 F.2d 156, 160 (8th Cir. 1990) ("Because there is no constitutional right to sentencing guidelines–or, more generally, to a less discretionary application of sentences than that permitted prior to the Guidelines–the limitations the Guidelines place on a judge's discretion cannot violate a defendant's right to due process by reason of being vague."); *United States v. Brierton*, 165 F.3d 1133, 1139 (7th Cir. 1999) (citing *Wivell* for proposition that Sentencing Guidelines "are not susceptible to attack under the vagueness doctrine"); *United States v. Salas*, No. 93-5897, 1994 WL 24982, at *1-*2 (6th Cir. Jan. 27, 1994) (unpublished disposition) (same). *But see Johnson*, 130 F.3d at 1354 (noting *Wivell* but undertaking vagueness analysis of Sentencing Guidelines on basis of binding

-13-

Ninth Circuit precedent). Nevertheless, because neither party has briefed this issue and because § 2B1.1(b)(6)(B) is not ambiguous or vague in any sense, we need not resolve whether the Sentencing Guidelines can ever be vague in the constitutional sense.

Because § 2B1.1(b)(6)(B) does not implicate First Amendment freedoms, Negri's challenge to the provision cannot be based on an assertion the guideline is vague on its face or in its hypothetical applications. *See United States v. Walker*, 137 F.3d 1217, 1219 (10 th Cir. 1998); *Johnson*, 130 F.3d at 1354. Instead, Negri must show that the guideline is vague as applied to the facts of his particular case. *See Chapman v. United States*, 500 U.S. 453, 467 (1991); *Walker*, 137 F.3d at 1219. Accordingly, the ultimate test is whether the provision at issue fails to give a person of ordinary intelligence fair warning that it applies to the conduct contemplated. *See Walker*, 137 F.3d at 1219 (citing *Kolender v. Lawson*, 461 U.S. 352, 357 (1983)).

Although Negri recognizes that the only court to undertake a vagueness analysis of the affects-a-financial-institution language rejected the notion that the term is vague, *see Johnson*, 130 F.3d at 1354, [4] he argues his case is distinguishable because he thieved the money from an armored car, rather than

---

[4]As noted above, the *Johnson* court was actually analyzing U.S.S.G. § 2F1.1(b)(6)(B). Nevertheless, § 2B1.1(b)(6)(B) is identical to § 2F1.1(b)(6)(B). *See supra* note 3.

directly from a bank. We disagree. As noted above, this court rejects Negri's claim that § 2B1.1(b)(6)(B) only applies to thefts directly from a bank vault. Furthermore, this court has no difficulty concluding § 2B1.1(b)(6)(B) gives fair warning to a person of ordinary intelligence that it would apply given the facts of this case: the theft from an armored car of $2.6 million that is being transported from the care, custody, and control of a Federal Reserve Bank to individual customer banks of the Federal Reserve.

### 3. U.S.S.G. § 3B1.3

Sentencing Guideline § 3B1.3 provides for a two-point increase in a defendant's base offense level if the following two conditions are met: (1) "the defendant abused a position of public or private trust"; and (2) that abuse "significantly facilitated the commission or concealment of the offense." U.S.S.G. § 3B1.3. On appeal, Negri concedes that his position as a Loomis security guard facilitated the commission of the theft, but asserts that he did not occupy a position of private trust. In defining the term "private trust," the application notes provide as follows:

> [Private trust] "refers to a position . . . characterized by professional or managerial discretion ( *i.e.*, substantial discretionary judgment that is ordinarily given considerable deference). Persons holding such positions ordinarily are subject to significantly less supervision than employees whose responsibilities are primarily non-discretionary in nature. . . . This adjustment would not apply in the case of an

embezzlement or theft by an ordinary bank teller or hotel clerk because such positions are not characterized by the above-described factors.

U.S.S.G. § 3B1.3 appl'n note 1. "This court reviews the question of whether an individual occupied a position of trust in a particular transaction for clear error." *United States v. Trammell*, 133 F.3d 1343, 1355 (10 th Cir. 1998).

This court has noted the following nonexclusive list of factors that courts have considered in determining whether a particular position constitutes a position of trust:

> the extent to which the position provides the freedom to commit a difficult-to-detect wrong, and whether an abuse could be simply or readily noticed; defendant's duties as compared to those of other employees; defendant's level of specialized knowledge; defendant's level of authority in the position; and the level of public trust.

*United States v. Williams*, 966 F.2d 555, 557 (10 th Cir. 1992). Applying these factors, we conclude the district court did not clearly err in finding that Negri occupied a position of trust.

Negri's supervisor testified that Negri was in charge of the armored car on the date of the theft. Although Negri's supervisory powers that day were not extensive, Negri's supervisor testified that Negri was in "complete control of the funds" and empowered to alter the route upon the happening of certain contingencies. This level of authority supports the district court's conclusion that Negri occupied a position of private trust. *Id.* The testimony of Negri's

supervisor that Negri's pre-employment screening and post-employment training were extensive further support the enhancement. *See id.* In addition, because Negri's position involved traveling with the armored car around the state of Oklahoma, his activities, unlike the activities of a simple bank teller, were hidden from the view of his direct supervisors. *See United States v. Hill*, 915 F.2d 502, 506-07 (9th Cir. 1990) (affirming § 3B1.3 adjustment where truck driver stole household items entrusted to his care during family's cross-country move in part because his "activities as a long-distance truck driver, almost by definition, were difficult, if not impossible, to observe during his cross-country trek"). Finally, and perhaps most importantly, in light of the fact that almost $3 million was in the armored car, the level of private trust between Negri and Loomis was enormous. *See United States v. Banks*, No. 98-1040, 1998 WL 870363, at *2-*3 (7th Cir. Dec. 14, 1998) (affirming § 3B1.3 adjustment for theft by armored car guard based exclusively on large sum of money in armored car); *see also United States v. Bennett*, 161 F.3d 171, 195 (3[d] Cir. 1998) (noting that where there has been reliance on the integrity of person occupying the position, the person likely occupies a position of trust). When these factors are viewed in combination, it becomes clear that the district court correctly determined that Negri occupied a position of trust and properly enhanced his sentence pursuant to §3B1.3.

## CONCLUSION

For all of the reasons set out above, the sentence imposed by the district court is hereby   **AFFIRMED** .


ENTERED FOR THE COURT


Michael R. Murphy
Circuit Judge