**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**AUG 7 2003**

**PATRICK FISHER**
**Clerk**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

UNITED STATES OF AMERICA,

    Plaintiff-Appellee,

v.

DONALD LACRUCE MILLER,

    Defendant-Appellant.

No. 02-7119
(Eastern District of Oklahoma)
(D.C. No. 02-CR-23-S)

**ORDER AND JUDGMENT**[*]

Before **SEYMOUR**, **MURPHY**, and **O'BRIEN**, Circuit Judges.

After examining the briefs and appellate record, this panel has determined

unanimously to grant the parties' request for a decision on the briefs without oral

argument. Fed. R. App. P. 34(f); 10th Cir. R. 34.1(G). The case is, therefore,

ordered submitted without oral argument.

---

[*]This order and judgment is not binding precedent, except under the
doctrines of law of the case, res judicata and collateral estoppel. The court
generally disfavors the citation of orders and judgments; nevertheless, an order
and judgment may be cited under the terms and conditions of 10th Cir. R. 36.3.

Defendant, Donald LaCruce Miller, owned and operated the Miller Farm Center in Sallisaw, Oklahoma, where he sold supplies used to care for horses. At the Miller Farm Center, Miller sold iodine crystals which can be used for legitimate purposes in caring for horses but can also be used to manufacture methamphetamine, a controlled substance.

On November 23, 1999, several Drug Enforcement Agency ("DEA") agents, acting upon intelligence information, visited Miller at the Miller Farm Center. The agents informed Miller that criminal penalties could be assessed against an individual who sold iodine crystals and had a reasonable belief that the crystals would be used to manufacture a controlled substance. Miller told the agents that he occasionally sold two ounce bottles of iodine crystals.

On three separate occasions in September 2000, an undercover agent purchased large quantities of iodine crystals from Miller at the Miller Farm Center. The undercover agent also purchased four gallons of iodine tincture from Miller on September 7, 2000.

On September 11, 2001, a search warrant was executed at the Miller Farm Center and Miller's residence. During the search, 10.375 pounds of iodine crystals were recovered. From 1998 until September 11, 2001, the Miller Farm Center had purchased 4840.5 pounds of iodine crystals for resale, fifty-one pounds of which were stolen during a burglary. Miller informed the agents

conducting the search that between 85 and 90 percent of his total iodine sales between 1998 and September 11, 2001 were for unlawful purposes. Accordingly, it was determined that Miller sold approximately 4062.25 pounds of iodine crystals for unlawful purposes.

On March 20, 2002, Miller was charged in a twelve-count indictment with: conspiracy to distribute a listed chemical and material in violation of 21 U.S.C. § 846; possession and distribution of listed chemicals in violation of 21 U.S.C. § 841(c)(2) and 18 U.S.C. § 2; conspiracy to commit money laundering in violation of 18 U.S.C. § 1956(h) and 18 U.S.C. § 2; money laundering in violation of 18 U.S.C. § 1956(a)(1)(A)(i) and 18 U.S.C. § 2; and criminal forfeiture in violation of 21 U.S.C. §§ 841(c), 841 (d), 846, 853. All counts were tried to a jury.

Daryl Charlton, an Oklahoma State Bureau of Investigation chemist, testified at trial that the amount of iodine crystals Miller sold for unlawful purposes, *i.e.*, 85 percent of the iodine crystals actually sold between 1998 and September 11, 2001, would yield 1110 pounds of methamphetamine. Charlton also reported in the presentence report (the "PSR") that this same amount of iodine crystals would convert to 1861 kilograms of hydriodic acid.

The jury convicted Miller on all counts. Utilizing the 2001 Sentencing Guidelines, the district court set Miller's base offense level at 28 based on the amount of iodine crystals attributed to his criminal conduct. The district court

sentenced Miller to 87 months' imprisonment; 36 months' supervised released; a special assessment of $1100; and forfeiture of the Miller Farm Center in Sallisaw, Oklahoma, $250,000, and all funds held in two separate bank accounts at First National Bank of Sallisaw, Oklahoma. Miller appeals his sentence, arguing that the district court violated the Ex Post Facto Clause of the United States Constitution when it sentenced him under the 2001 Sentencing Guidelines instead of the 2000 Sentencing Guidelines.

Miller failed to object to the application of the 2001 Sentencing Guidelines; therefore, this court reviews only for plain error. *United States v. Malone*, 222 F.3d 1286, 1296 (10th Cir. 2000). "To establish plain error [the defendant] must show: (1) an error, (2) that is plain, which means clear or obvious under current law, and (3) that affects [the defendant's] substantial rights." *United States v. Whitney*, 229 F.3d 1296, 1308 (10th Cir. 2000) (quotation omitted). Plain error review, however, is inappropriate "when the alleged error involves the resolution of factual disputes." *United States v. Easter*, 981 F.2d 1549, 1556 (10th Cir. 1992).

Typically, a defendant is sentenced under the version of the Sentencing Guidelines in effect at the time of sentencing. *United States v. Farrow*, 277 F.3d 1260, 1264 (10th Cir. 2002). "The Ex Post Facto Clause, however, prohibits retroactive application of an amended guideline provision if the amendment

-4-

disadvantages the defendant." *United States v. Orr*, 68 F.3d 1247, 1252 (10th Cir. 1995) (quotation omitted). To constitute an ex post facto violation, the law "must be retrospective, that is, it must apply to events occurring before its enactment; and second, it must disadvantage the offender affected by it." *Miller v. Florida*, 482 U.S. 423, 430 (1987).

Under the 2001 Sentencing Guidelines, the version of the Sentencing Guidelines in effect at the time of Miller's sentencing, iodine was categorized as a List II chemical and the base offense level of 28 was set for the quantity of iodine crystals possessed and distributed by Miller in violation of 21 U.S.C. § 841(c)(2). U.S.S.G. § 2D1.11(e)(2) (setting the base offense level of 28 for an offense involving the quantity of 376.2 grams or more of iodine). Iodine, however, was not listed as a chemical in § 2D1.11 of the 2000 Sentencing Guidelines, the version in effect at the time Miller committed the criminal conduct at issue in this case.[1] "If the offense is a felony or Class A misdemeanor for which no guideline expressly has been promulgated, [the court must] apply the most analogous offense guideline." U.S.S.G. § 2X5.1. Therefore, if Miller was sentenced under the 2000 Sentencing Guidelines he would be sentenced under the

---

[1] Iodine was specifically designated as a List II chemical by the Comprehensive Methamphetamine Control Act of 1996, 21 U.S.C. § 802(35)(I).

guideline which is most closely analogous to possession and distribution of iodine.

As reported in the PSR, iodine crystals are used to create hydrogen iodide which, in the presence of water, becomes hydriodic acid, a List I chemical that is a reagent used in the production of methamphetamine. This fact was also utilized by the 2001 Sentencing Guidelines to determine the penalties for offenses involving iodine. U.S.S.G. App. C. Supp., amend. 625 at 205. Therefore, the closest offense guideline to distribution of iodine is either the guideline levels for unlawfully distributing, importing, exporting, or possessing hydriodic acid or for unlawfully manufacturing, importing, exporting, or trafficking methamphetamine. U.S.S.G. §§ 2D1.11, 2D1.1. Charlton determined that the amount of iodine crystals Miller distributed for unlawful purposes would convert to 1861 kilograms of hydriodic acid.[2] The 2000 Sentencing Guidelines establishes a base offense level of 30 for an offense involving 44 kilograms or more of hydriodic acid. U.S.S.G. § 2D1.11(d)(1). At trial, Charlton also testified that the amount of iodine crystals Miller distributed for unlawful purposes would yield 1110 pounds of methamphetamine. The 2000 Sentencing Guidelines establishes a base offense level of 38 for an offense involving 15 kilograms or more of methamphetamine.

---

[2] Miller argues that the estimates of hydriodic acid and methamphetamine that could be derived from the quantity of iodine crystals attributed to Miller's criminal conduct were not supported by sufficient evidence. However, there can be no plain error review of this factual question. *See United States v. Easter*, 981 F.2d 1549, 1556 (10th Cir. 1992).

U.S.S.G. § 2D1.1(c)(1).  Therefore, because Miller would have received a higher

base offense level under the 2000 Sentencing Guidelines, he was not

disadvantaged by the application of the 2001 Sentencing Guidelines.

Consequently, there is no ex post facto violation.

For the reasons stated above, this court **AFFIRMS** Miller's sentence.

ENTERED FOR THE COURT


Michael R. Murphy
Circuit Judge