**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**NOV 18 1999**

**PATRICK FISHER**
**Clerk**

PUBLISH

## UNITED STATES COURT OF APPEALS

### TENTH CIRCUIT

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

v.

RICKY HILL,

Defendant-Appellant.

No. 98-1446

**APPEAL FROM UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
(D.C. No. 98-CR-189-WM)**

Kirkland L. Brush, Fort Collins, Colorado, for the appellant.

Andrew A. Vogt, Assistant U.S. Attorney (Thomas L. Strickland, U.S. Attorney, District of Colorado, with him on the brief), Denver, Colorado, for the appellee.

Before **BALDOCK**, **BRISCOE,** Circuit Judges, and **CROW**, District Judge.[1]

**BRISCOE**, Circuit Judge.

---

[1] Honorable Sam A. Crow, Senior District Judge, of the United States District Court for the District of Kansas, sitting by designation.

Defendant Ricky Hill appeals his convictions and sentences for executing a scheme or artifice to defraud a financial institution in violation of 18 U.S.C. § 1344(1). We exercise jurisdiction pursuant to 28 U.S.C. § 1291 and affirm.

I.

On April 4, 1997, a California business named Alpine Electronics of America (Alpine) issued a check in the amount of $21,826.15 to another California business, Federal Sign, as payment for a project Federal Sign had performed for Alpine. The check, made payable directly to Federal Sign, also read: "Attn: Susan Turner," in reference to Federal Sign's project manager. Although Federal Sign received the check, it was subsequently stolen by an employee before it could be cashed.

By late April 1997, the check made its way to a California resident named Dorothy Halladay. Halladay retained possession of the check until late June 1997, when she traveled from California to Colorado. Once in Colorado, Halladay contacted a friend, Joe Moore, and asked him if he knew how to cash the stolen check. In response, Moore gave Halladay defendant Hill's name and pager number. Halladay contacted Hill and informed him she wanted to cash the stolen check. Hill directed Halladay to meet him the following day, June 27, 1997, at a convenience store in Loveland, Colorado.

Hill and Halladay met as planned at the convenience store in Loveland.

After looking at the check, the pair agreed they would each receive approximately $6,000, and the two other individuals involved in the crime (i.e., Moore and the individual who originally gave the check to Halladay) would each receive approximately $5,000. Hill directed Halladay to endorse the check in the name of Susan Turner and then write "Pay to the order of Ricky Hill." ROA, Vol. 4, at 79. After Halladay endorsed the check as directed, Hill took the check, walked across the street to Norwest Bank, and deposited the check in his checking account. Upon his return, Hill advised Halladay that "everything went fine," and it would be three to five days before the check cleared. Id.

Bank records indicate that, after depositing the stolen check, Hill made five withdrawals from the account over a period of approximately ten days: on June 29, 1997, Hill withdrew $200 by ATM withdrawal; on July 2, 1997, Hill withdrew $6,000 by cashing a check payable to "Cash"; on July 7, 1997, Hill withdrew $1,000 by cashing a check payable to "Cash"; on July 7, 1997, Hill withdrew $10,000 by cashing a check payable to "Cash"; and on July 7, 1997, Hill wrote a check in the amount of $1,500 payable to an individual named Courtland James (which check was subsequently negotiated). ROA, Vol. 1, Doc. 13 (indictment). In accordance with their agreement, Hill gave Halladay a cashier's check in the amount of $10,000 (from this amount, Halladay was to pay $5,000 to the individual in California who gave her the stolen check; in addition, Halladay was

to subsequently receive an extra $1,000 from Hill). Hill also gave Moore approximately $5,500 for his role in the crime.

The fraud was subsequently discovered, investigated, and reported to authorities by Norwest Bank. In January 1998, Hill was interviewed by an FBI agent and admitted cashing the check and making withdrawals from the proceeds. Hill was subsequently indicted on May 7, 1998, on five counts of executing a scheme or artifice to defraud Norwest Bank in violation of 18 U.S.C. § 1344 (each of the withdrawals made by Hill was charged as a separate count). Hill was ultimately tried and convicted on all five counts and sentenced to concurrent terms of imprisonment of fifteen months, plus restitution in the full amount of the stolen check.

## II.

*Speedy trial issues*

Hill contends the district court violated his statutory and constitutional rights to a speedy trial by granting the government an open-ended continuance in order to resolve issues arising as a result of the panel decision in United States v. Singleton, 144 F.3d 1343 (10th Cir. 1998) (holding that a federal prosecutor violates 18 U.S.C. § 201(c)(2) by offering leniency to a criminal defendant in exchange for testimony). We first address Hill's statutory arguments, followed by his constitutional arguments.

## a. Speedy Trial Act

The Speedy Trial Act, designed to protect a criminal defendant's constitutional right to a speedy trial and to serve the public interest in ensuring prompt criminal proceedings, requires that a criminal defendant's trial commence within 70 days after his indictment or initial appearance, whichever is later. See 18 U.S.C. § 3161(C)(1); United States v. Lugo, 170 F.3d 996, 1000-01 (10th Cir. 1999). Certain periods of delay are excluded and do not count toward the 70-day limit. See 18 U.S.C. § 3161(h)(1)-(9). In particular, the Act excludes any period of delay "resulting from a continuance granted by any judge . . . on the basis of its findings that the ends of justice served by taking such action outweigh the best interest of the public and the defendant in a speedy trial." 18 U.S.C. § 3161(h)(8)(A).

In order for a continuance to qualify as an excludable "ends-of-justice" continuance under § 3161(h)(8)(A), certain prerequisites must be satisfied. First, the trial court must consider the factors listed in § 3161(h)(8)(B):

> (i) Whether the failure to grant such a continuance in the proceeding would be likely to make a continuation of such proceeding impossible, or result in a miscarriage of justice.

> (ii) Whether the case is so unusual or so complex, due to the number of defendants, the nature of the prosecution, or the existence of novel questions of fact or law, that it is unreasonable to expect adequate preparation for pretrial proceedings or for the trial itself within the time limits established by [the Act].

(iii) Whether, in a case in which arrest precedes indictment, delay in the filing of the indictment is caused because the arrest occurs at a time such that it is unreasonable to expect return and filing of the indictment within the period specified in section 3161(b), or because the facts upon which the grand jury must base its determination are unusual or complex.

(iv) Whether the failure to grant such a continuance in a case which, taken as a whole, is not so unusual or so complex as to fall within clause (ii), would deny the defendant reasonable time to obtain counsel, would unreasonably deny the defendant or the Government continuity of counsel, or would deny counsel for the defendant or the attorney for the Government the reasonable time necessary for effective preparation, taking into account the exercise of due diligence.

After considering these factors, the trial court must then set forth, "in the record of the case, either orally or in writing, its reasons for finding that the ends of justice served by the granting of such continuance outweigh the best interests of the public and the defendant in a speedy trial." 18 U.S.C. § 3161(h)(8)(A). Although the trial court's findings "may be entered on the record after the fact, they may not be made after the fact." United States v. Doran, 882 F.2d 1511, 1516 (10th Cir. 1989). Instead, "[t]he balancing must occur contemporaneously with the granting of the continuance because Congress intended that the decision to grant an ends-of-justice continuance be prospective, not retroactive . . . ." Id.

We review a district court's application of the legal standards of the Act de novo, 18 U.S.C. §§ 3161-74, and its underlying factual findings for clear error. United States v. Spring, 80 F.3d 1450, 1456 (10th Cir.1996). As for a district

-6-

court's decision to grant an ends-of-justice continuance under § 3161(h)(8), we apply an abuse of discretion standard. United States v. Gonzales, 137 F.3d 1431, 1433 (10th Cir. 1998). In conducting our review, we must keep in mind that an ends-of-justice continuance under subsection (h)(8) is "a 'rarely used tool' for those cases demanding more flexible treatment," Doran, 882 F.2d at 1515 (quoting United States v. Tunnessen, 763 F.2d 74, 76 (2d Cir. 1985)), and the record must clearly establish that the district court considered the proper factors at the time such a continuance was granted. Id. at 1516.

In order to determine whether the continuance granted by the district court in this case properly qualifies as an ends-of-justice continuance, it is necessary to review in detail the procedural history of the case and the events that precipitated the filing and granting of the motion for continuance. Hill was indicted and the Speedy Trial Act clock began running on May 7, 1998. Hill's trial was originally scheduled for July 13, 1998, approximately three days prior to the 70-day speedy trial cut-off of July 16, 1998. On July 7, 1998, the government filed a motion for continuance of the trial date and for establishment of a status conference. ROA, Vol. 1, Doc. 19. In its motion, the government indicated its key witness at trial would be Dorothy Halladay, the woman alleged to have participated with Hill in the charged crimes. Id. at 1-2. According to the government, Halladay had entered into a plea agreement pursuant to which she agreed to plead guilty and

testify against Hill in return for the government's promise to file a motion pursuant to U.S.S.G. § 5K1.1 asking that she receive a stipulated sentence of probation. Id. at 2. The problem with proceeding to trial, the government indicated, was the effect of the panel decision in Singleton, which was issued on July 1, 1998:

> It appears from the Singleton opinion that the government will have to withdraw from, or seek to revise, its plea agreement with Dorothy Halladay, as the current state of the law post-Singleton is that the government cannot legally bargain for her testimony. Arguably, this makes her "unavailable", as an essential witness, within the meaning of 18 U.S.C. 3161(h)(3)(A). (citation omitted). Moreover, any attempt by the government to withdraw from its Plea Agreement with Halladay implicates the holding in United States v. Cooper, 70 F.3d 563 (10th Cir. 1995). Additionally, the government must also reassess its entire case-in-chief to determine if it can and should proceed at trial without [Halladay]. Given the immediate proximity of the trial date, it is unreasonable to expect the government to be able to proceed to trial on July 13, 1998. If the government were required to proceed to trial on that date, it would, in all likelihood, have to do so without [Halladay], which would leave no choice but to dismiss the prosecution.

Id. at 3. Based upon these perceived problems, the government asked the district court to grant an ends of justice continuance pursuant to 18 U.S.C. § 3161(h)(8)(A) and (B). Id. at 4. The government also asked the district court to "schedule a status conference in approximately thirty days, at which time further developments regarding Singleton may help clarify the issues and permit the scheduling of further proceedings." Id. at 6.

On July 10, 1998, the district court issued an order granting the

-8-

government's motion for a continuance.  Id., Doc. 22.  In doing so, the district court cited several reasons why it believed an ends-of-justice continuance was appropriate.  First, the district court concluded that "deny[ing] the motion . . . and forc[ing] the government to try the case without an essential witness, without affording the government an opportunity to obtain and present necessary evidence in a manner that d[id] not run afoul of Singleton, would result in a miscarriage of justice."  Id. at 2 (citing 18 U.S.C. § 3161(h)(8)(B)(i)).  Second, the district court concluded "the consequences of Singleton upon the facts and proceedings . . . g[a]ve rise to novel questions of law and fact so unusual and complex that it [wa]s unreasonable to expect adequate government preparation for the trial within the speedy trial deadline."  Id. (citing 18 U.S.C. § 3161(h)(8)(B)(ii)).  Third, the district court concluded that "[f]ailure to grant a continuance would deny the government's attorney 'the reasonable time necessary for effective preparation' in light of the fact that, for reasons beyond the government's control, it [might not] be able to obtain the testimony of its key witness."  Id. at 2-3 (quoting 18 U.S.C. § 3161(h)(8)(B)(iv)).

As part of its continuance order, the district court directed the government to inform defense counsel, within fifteen days of the continuance order, "whether it intend[ed] to use the testimony of Halladay at trial and, if so, the terms of Halladay's agreement to appear as a witness for the government."  Id. at 3.

Further, the district court set a status conference for August 11, 1998, "to resolve any pending motions and, if necessary, to set the case for prompt trial." Id.

On July 23, 1998, Hill filed a motion to dismiss the indictment on speedy trial grounds. In pertinent part, Hill argued the continuance violated the provisions of the Speedy Trial Act. On August 3, 1998, the district court denied defendant's motion to dismiss. On August 11, 1998, the district court conducted the scheduled status conference and set a trial date for September 8, 1998. As previously noted, the trial took place as scheduled on September 8, 1998, and Hill was convicted on all five counts charged in the indictment.

Based upon these relevant facts, we conclude the continuance granted by the district court properly qualifies as an ends-of-justice continuance under the Speedy Trial Act. In the first place, the procedural history indicates the district court complied with the dictates of § 3161(h)(8) by considering the necessary factors and setting forth in the record its reasons for granting the continuance. Further, the district court's bases for granting the continuance were clearly justified by the record. In light of the Singleton decision, which was filed a mere twelve days prior to the originally scheduled trial date (and fifteen days prior to the original 70-day time limit), the district court was entirely correct in concluding that a failure to grant the continuance requested by the government (1) could result in a miscarriage of justice by forcing the government to proceed without its key

witness (i.e., Dorothy Halladay), and (2) would deny government counsel the reasonable time necessary to effectively prepare to try the case without violating the dictates of <u>Singleton</u>.[2] Although Hill suggests the government could simply have moved to dismiss the indictment without prejudice, that would have placed the government in an impossible predicament: Upon filing a new indictment, the government would have had less than ten days to bring the case to trial.

In a secondary argument, Hill complains the continuance was open-ended. Although a few circuits have suggested an ends-of-justice continuance must be specifically limited in time, we have held "that, while it is preferable to set a specific ending date for a continuance, there will be rare cases where that is not possible, and an open-ended continuance for a reasonable time period is permissible." <u>Spring</u>, 80 F.3d at 1458. Considering the circumstances surrounding the government's request for a continuance, we conclude this is one of those rare cases. In particular, this court's interpretation of 18 U.S.C. § 201(c)(2) in <u>Singleton</u> left the prosecution unclear on how to proceed with its case against defendant, which depended heavily upon the testimony of Halladay. Importantly, the district court established a specific and limited time limit for the

---

[2] We find it unnecessary to address the district court's conclusion that the issuance of <u>Singleton</u> "g[a]ve rise to novel questions of law and fact so unusual and complex that it [wa]s unreasonable to expect adequate government preparation for the trial within the speedy trial deadline." ROA, Vol. 1, Doc. 22, at 2.

government to decide whether to proceed with its use of Halladay as a key witness. Further, the district court scheduled a status conference for little more than one month after the continuance was granted in order to assess the positions of the parties and establish a firm trial date. At that status conference, the district court established a trial date less than one month after the status conference.

In the end, we conclude the continuance, which amounted to slightly more than sixty days, was reasonable and therefore excludable under the Speedy Trial Act.

### b. *Sixth Amendment right to a speedy trial*

"In determining whether a defendant has been deprived of his constitutional right to a speedy trial under the Sixth Amendment, a court should consider and balance the following factors: (1) the length of the delay; (2) the reason for the delay; (3) the defendant's assertion of his right to a speedy trial; and (4) prejudice to the defendant." Lugo, 170 F.3d at 1002. Of these factors, the length of the delay is the threshold consideration. Id. Only if the delay is "presumptively prejudicial" will the court need to consider the remaining factors. Id.

Here, the total length of time between indictment and trial was approximately four months. Because this delay is not presumptively prejudicial under existing circuit precedent, see id. (concluding delay of seven months was not presumptively prejudicial), there was no violation of Hill's rights under the Sixth

-12-

Amendment.

*Legality of charged conduct*

Hill contends he is entitled to a judgment of acquittal because the conduct alleged in the indictment and proven at trial, i.e., depositing a single forged check and then making a series of withdrawals from the deposited funds, does not violate 18 U.S.C. § 1344(1). Whether the charged conduct can constitute a scheme to defraud in violation of § 1344(1) is a question of law we review de novo. United States v. Bonnett, 877 F.2d 1450, 1454 (10th Cir. 1989).

The statute Hill was charged under, § 1344(1), makes it unlawful for a person to "knowingly execute[], or attempt[] to execute, a scheme or artifice . . . to defraud a financial institution." In order to establish a violation of this statute, the government must show: (1) that the defendant knowingly executed or attempted to execute a scheme or artifice to defraud a financial institution; (2) that the defendant did so with the intent to defraud the financial institution; and (3) that the financial institution was federally insured.[3] United States v. Hoglund, 178 F.3d 410, 412-13 (6th Cir. 1999); United States v. Rackley, 986 F.2d 1357, 1360

---

[3] Some courts have also considered whether the government must establish that the defendant's fraud scheme placed at least one financial institution at a risk of loss. See Hoglund, 178 F.3d at 413 (discussing cases). It is unnecessary for us to decide here whether this is an essential element because, even assuming it is, the evidence presented at trial demonstrated Norwest Bank actually suffered a loss as a result of Hill's conduct.

(10th Cir. 1993).

Of these essential elements, only the first is at issue.  More specifically, the narrow issue raised by Hill is whether the conduct charged in the indictment and proven at trial constitutes a "scheme or artifice to defraud."  Because the phrase "scheme or artifice to defraud" is not defined in the statute, we must "construe it in accord with its ordinary or natural meaning."  Smith v. United States, 508 U.S. 223, 228 (1993); see United States v. Roberts, 88 F.3d 872, 877 (10th Cir. 1996) (stating that if Congress does not define statutory term, "its common and ordinary usage may be obtained by reference to a dictionary").  Black's defines the word "scheme" as "[a] design or plan formed to accomplish a purpose."  Black's Law Dictionary 1344 (6th ed. 1990).  Further, Black's defines the word "artifice" as "[a]n ingenious contrivance or device of some kind."  Id. at 113.  In light of these definitions, the phrase "scheme or artifice to defraud" simply requires a design, plan, or ingenious contrivance or device to defraud.

Applying this definition to the case at hand, we have little trouble concluding the facts alleged in the indictment and proven at trial sufficiently demonstrate a "scheme or artifice to defraud."  As alleged in the indictment and proven at trial, Hill was contacted by Dorothy Halladay on or about June 26, 1997, and the pair proceeded to discuss the possibility of cashing a stolen check.  The following day, June 27, 1997, Hill and Halladay met in person.  At that time, Hill

-14-

personally examined the check and then instructed Halladay to forge the signature of Susan Turner and endorse it as payable to him. After Halladay did so, Hill endorsed the check and immediately deposited it into his personal checking account at Norwest Bank. Thereafter, on five separate occasions over a period of approximately ten days, Hill made withdrawals of the funds via check or ATM. These facts, considered together, demonstrate that Hill, with Halladay's assistance, devised and executed a plan to defraud Norwest Bank by depositing a stolen check and then withdrawing the proceeds. Nothing further was required under the statute. See United States v. Bernards, 166 F.3d 348, 1998 WL 826843 at *3 (10th Cir. 1998) (concluding defendant's act of depositing a nonnegotiable coupon into his checking account and then making a subsequent series of withdrawals from the account constituted a "scheme or artifice to defraud" under § 1344(1)).

*Jury composition*

On the opening day of trial, Hill, who is an African-American, objected to the jury pool on the grounds that "[t]here were some 50 or more people that appeared, and not a single person in that group was African-American in appearance." ROA, Vol. 3, at 4. The district court chose to proceed with the trial without immediately addressing Hill's objection. After trial, Hill filed a motion for a new trial on the grounds that his Sixth Amendment right to a petit jury selected from a fair cross-section of the community had been violated. The district

-15-

court denied Hill's motion. On appeal, Hill contends the district court erred in denying his motion for new trial. Because the district court's decision turned on an issue of law, we apply a de novo standard of review. Weese v. Schukman, 98 F.3d 542, 549 (10th Cir. 1996); United States v. Hughes, 33 F.3d 1248, 1251 (10th Cir. 1994).

The Sixth Amendment requires that petit juries in criminal trials be "drawn from a fair cross section of the community." Taylor v. Louisiana, 419 U.S. 522, 527 (1975). This does not guarantee that a petit jury will be "of any particular composition." Id. at 538. Instead, it requires only that the pools of names "from which [petit] juries are drawn must not systematically exclude distinctive groups in the community and thereby fail to be reasonably representative thereof." Id. at 538. In order to establish a prima facie violation of the Sixth Amendment fair cross-section requirement, a criminal defendant must show:

> (1) that the group alleged to be excluded is a "distinctive" group in the community; (2) that the representation of this group in venires from which juries are selected is not fair and reasonable in relation to the numbers of such persons in the community; and (3) that this underrepresentation is due to systematic exclusion of the group in the jury-selection process.

Duren v. Missouri, 439 U.S. 357, 364 (1979).

Here, a review of the record demonstrates Hill failed to establish a prima facie violation of his Sixth Amendment rights. Although it was undisputed that African-Americans represented a "distinctive" group in the area from which the

jury pool was drawn, Hill failed to present evidence to establish the second and third prongs of the prima facie test.  In particular, Hill established only that there was an underrepresentation of African-Americans in the particular jury pool utilized in his case.  This circuit and others have repeatedly emphasized that such evidence, i.e., evidence of a discrepancy on a single venire panel, is insufficient to demonstrate systematic exclusion.  See, e.g., United States v. DeFries, 129 F.3d 1293, 1301 (D.C. Cir. 1997); Phea v. Benson, 95 F.3d 660, 662 (8th Cir. 1996); United States v. Ruiz-Castro, 92 F.3d 1519, 1527 (10th Cir. 1996); United States v. Edwards, 69 F.3d 419, 437 (10th Cir. 1995).  Accordingly, we conclude the district court properly denied Hill's motion for a new trial.

*Application of U.S.S.G. § 2F1.1(b)(2)(A)*

Hill contends the district court erred in enhancing his base offense level by two levels for "more than minimal planning" pursuant to U.S.S.G. § 2F1.1(b)(2)(A).  Under § 2F1.1(b)(2)(A), a sentencing court is required to increase a defendant's base offense level by two levels if it finds the offense involved "more than minimal planning."  "[M]ore than minimal planning" is deemed to exist "in any case involving repeated acts over a period of time, unless it is clear that each instance was purely opportune."  U.S.S.G. § 1B1.1 comment. (n.1(f)); United States v. Ensminger, 174 F.3d 1143, 1147 (10th Cir. 1999). The question of whether an offense involved "more than minimal planning" is a factual

-17-

determination we review for clear error. United States v. Orr, 68 F.3d 1247, 1253 (10th Cir. 1995).

Based upon the evidence presented at trial, we conclude the district court did not commit clear error in finding the charged offenses involved more than minimal planning. As already discussed, the scheme to defraud Norwest Bank was developed over a period of two days during a phone conversation and an in-person meeting between Hill and Halladay. The scheme was then executed over a period of approximately ten days by Halladay endorsing the check, Hill endorsing the check and depositing it in his account, Hill checking with the bank to determine if the check had cleared, Hill making a series of withdrawals, and Hill distributing the withdrawn cash to himself, Halladay, and Moore. In short, the criminal conduct, considered as a whole, involved repeated acts over a period of time, and thus involved "more than minimal planning" for purposes of § 2F1.1(b)(2)(A).

*Applicability of U.S.S.G. § 3E1.1*

Hill contends the district court erred in denying his request for a two-point reduction pursuant to U.S.S.G. § 3E1.1 for acceptance of responsibility. Section 3E1.1 of the Sentencing Guidelines provides for a two-point downward adjustment in the base offense level if "the defendant clearly demonstrates acceptance of responsibility for his offense." A defendant bears the burden of proving his entitlement to this adjustment. United States v. Reed, 114 F.3d 1053, 1058 (10th

Cir.) cert. denied, 118 S. Ct. 316 (1997). A district court's decision regarding

whether a defendant has accepted responsibility for purposes of § 3E1.1 is a

factual determination we review only for clear error. See United States v. Janusz,

135 F.3d 1319, 1325 (10th Cir. 1998); U.S.S.G. § 3E1.1, comment. (n.5) (stating

district court's determination of this issue is entitled to "great deference on

review").

Hill's primary contention is that he proceeded to trial solely to preserve his

legal argument that the conduct charged in the indictment did not violate the bank

fraud statute. Application Note 2 to § 3E1.1 is relevant to this argument:

> Th[e] adjustment [provided by § 3E1.1] is not intended to apply to a
> defendant who puts the government to its burden of proof at trial by
> denying the essential factual elements of guilt, is convicted, and only
> then admits guilt and expresses remorse. Conviction by trial,
> however, does not automatically preclude a defendant from
> consideration for such a reduction. In rare situations a defendant may
> clearly demonstrate an acceptance of responsibility for his criminal
> conduct even though he exercises his constitutional right to a trial.
> This may occur, for example, where a defendant goes to trial to assert
> and preserve issues that do not relate to factual guilt (e.g., to make a
> constitutional challenge to a statute or a challenge to the applicability
> of a statute to his conduct). In each such instance, however, a
> determination that a defendant has accepted responsibility will be
> based primarily upon pre-trial statements and conduct.

U.S.S.G. § 3E1.1, comment. (n.2).

Although it is true that Hill's argument regarding the applicability of the

bank fraud statute to his conduct is a purely legal one, he conveniently ignores the

fact that he never admitted, prior to trial, all of the essential elements of the

-19-

charged crimes. In particular, although he admitted to cashing the check and making subsequent withdrawals, he attempted to argue that his conduct was innocent and without intention to defraud Norwest Bank. More specifically, he argued (1) he did not know the check was stolen, (2) any suspicions he may have had about the legitimacy of the check were quashed when Norwest Bank cashed the check, (3) he was merely assisting Halladay in cashing the check, and (4) he thought Halladay was paying him part of the check proceeds in return for his assistance in cashing the check. See, e.g., ROA, Vol. 4, at 169-74, 177-78, 181. Thus, we conclude the district court did not commit clear error in denying Hill's request for a § 3E1.1 reduction.

*Legality of plea concession*

Hill contends it was unlawful, under the so-called "anti-bribery" statute, 18 U.S.C. § 201(c)(2), as well as Rule 3.4(b) of the Colorado Rules of Professional Conduct, for the prosecution to promise leniency to Dorothy Halladay in exchange for her testimony against him at trial. Although Hill acknowledges the en banc decision in United States v. Singleton, 165 F.3d 1297 (10th Cir.), cert. denied, 119 S. Ct. 2371 (1999), he contends his case falls outside Singleton because Halladay's trial testimony differed significantly from statements she initially made to law enforcement officers. In other words, Hill argues, the prosecutors in his case promised leniency to Halladay only if she would testify contrary to her original

statements.

Hill's arguments notwithstanding, it is apparent the en banc decision in Singleton controls. In Singleton, the en banc court held that § 201(c)(2) did not apply to the United States acting in its sovereign capacity and accordingly did not preclude the United States Attorney's office from offering an accomplice leniency in exchange for truthful testimony. 165 F.3d at 1298-1302. That is precisely what occurred here. Under the terms of the plea agreement between the government and Halladay, the government agreed to recommend a downward departure in Halladay's sentence in return for Halladay's "cooperation, including, but not limited to, truthful and complete testimony" at defendant's trial. ROA, Vol. 1, Doc. 29, at 2. In short, the government offered concessions to Halladay not for false testimony on her part, but rather only for truthful testimony.[4]

As for Hill's argument that the prosecutors' conduct violated Rule 3.4(b) of the Colorado Rules of Professional Conduct, it is precluded by our conclusion that the prosecutors did not violate § 201(c)(2). Rule 3.4(b) of the Colorado Rules of Professional Conduct provides that a lawyer shall not "offer an inducement to a witness that is prohibited by law" (emphasis added). Because Hill has failed to

---

[4] Even if the prosecution had violated § 201(c)(2), no basis would exist for excluding Halladay's testimony because, although Congress mandated fines and imprisonment for those who illicitly compensate a witness for testimony, it did not compel the suppression of that testimony. See United States v. Ware, 161 F.3d 414, 424-25 (6th Cir. 1998), cert. denied, 119 S. Ct. 1348 (1999).

demonstrate the prosecution violated § 201(c)(2) or any other law, there is no basis

for concluding its conduct violated Rule 3.4(b).  See, e.g., United States v. Flores,

172 F.3d 695, 699 n.4 (9th Cir. 1999).  In any event, even if the prosecutors'

conduct did violate Rule 3.4(b), that would not result in the exclusion of

Halladay's testimony.  See United States v. Condon, 170 F.3d 687, 690 (7th Cir.),

cert. denied, 119 S. Ct. 1784 (1999).

### III.

The judgment of the district court is AFFIRMED.