**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**

UNITED STATES OF AMERICA,

      Plaintiff - Appellee,

v.

No. 03-3018

TIMOTHY J. SWANSON,

      Defendant - Appellant.

ORDER

Filed March 9, 2004

Before **HENRY, BALDOCK** and **TYMKOVICH**, Circuit Judges.

Appellee's motion to publish the order and judgment filed on January 26, 2004 is granted. A copy of the published opinion is attached.

Entered for the Court
PATRICK FISHER, Clerk of Court


by:
Nicole Allison
Deputy Clerk

**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**JAN 26 2004**

**PATRICK FISHER**
**Clerk**

PUBLISH

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

UNITED STATES OF AMERICA,

    Plaintiff-Appellee,

v.

TIMOTHY J. SWANSON,

    Defendant-Appellant.

No. 03-3018

**Appeal from the United States District Court**
**for the District of Kansas**
**(D.C. No. 02-CR-10031)**

Lee Thompson, of Thompson, Stout & Goering, Wichita, Kansas, for Defendant-Appellant.

Eric F. Melgren, United States Attorney (Debra L. Barnett, Assistant United States Attorney, with him on the brief), Wichita, Kansas for Plaintiff-Appellee.

Before **HENRY**, **BALDOCK**, and **TYMKOVICH**, Circuit Judges.

**HENRY**, Circuit Judge.

    Timothy J. Swanson was convicted of one count of bank fraud under 18 U.S.C. § 1344(1), which makes it a crime to "knowingly execute[], or attempt[] to

execute, a scheme or artifice to defraud a financial institution." The underlying indictment charged that Mr. Swanson defrauded NationsBank, N.A. of Wichita and two other financial institutions by means of a check kite scheme. Mr. Swanson engaged in an elaborate scheme of circulating checks backed by insufficient funds among eleven bank accounts. When NationsBank detected the scheme, it stopped Mr. Swanson's check writing ability and allowed all outstanding checks to be presented against his accounts. The resulting overdraft was approximately $522,000. Following a jury verdict of guilty, Mr. Swanson was sentenced to a prison term of 51 months. Mr. Swanson now appeals both his conviction and sentence; for the reasons below, we AFFIRM.

## I. BACKGROUND

### A. Factual Background

Since 1989, Mr. Swanson has managed oil and gas businesses in Kansas and Oklahoma under his own name and under the umbrella of other entities. During this period, Mr. Swanson maintained at least eleven personal and business checking accounts at NationsBank in Wichita, Kansas. Mr. Swanson had signatory powers on all of these accounts. Mr. Swanson and his companies also borrowed substantial sums of money from NationsBank. These loans were secured by personal guarantees and collateral, which included mortgages of oil

2

and gas properties.

As a customer of NationsBank, Mr. Swanson frequently wrote checks that caused his accounts to be overdrawn, sometimes in amounts as high as $100,000. These overdrafts were routinely paid by NationsBank. In February 1999, NationsBank gave Mr. Swanson, in his capacity as owner and manager of Swanson Oil, the use of a "Controlled Disbursement Account" ("CDA"), an account reserved for use by businesses. A CDA is a checking account that provides the account holders with a daily report on which checks will be clearing the account and on what collected balances they have in the account, allowing businesses to determine their daily cash position. The CDA was coded "pay all," meaning that the bank would pay all the checks presented against the account. This account also had a feature providing for an automatic transfer of funds from the CDA, which was maintained at a remote site, into a regular business account. The remote location had the effect of lengthening the "float time" before posting for the checks written on the account.

In March 1999, Mr. Swanson started "day trading" in the stock market, using his established brokerage accounts at Prudential Securities in Wichita to buy and sell blocks of securities on a daily basis, in an attempt to make money on changes in market prices. Mr. Swanson's daily purchases and sales of securities frequently exceeded $100,000 a day. Mr. Swanson's brokerage accounts at

3

Prudential also had check writing privileges through banks in Columbus, Ohio and Boston. These banks required stock values or deposits sufficient to cover all of the checks Mr. Swanson wrote on these accounts. This requirement resulted in a daily "margin call" in which Mr. Swanson was required to deposit funds with Prudential which were adequate to cover the value of the stocks he had purchased "on the margin," i.e., with money borrowed from the brokerage firm. Prudential did not accept payments for the daily margin calls based on uncollected funds. Therefore, when Mr. Swanson delivered checks to Prudential, which he did on a daily basis, the Prudential staff called NationsBank to confirm that Mr. Swanson had collected funds in his accounts sufficient to cover his checks. Eventually, for administrative convenience, Prudential required Mr. Swanson to provide cashier's checks, a cash equivalent, to cover his margin calls.

In spring and summer of 1999, Mr. Swanson's losses in the stock market grew, and margin calls became more difficult to meet. Thus, Mr. Swanson began to use the float time provided by the CDA as a means of gaining time in meeting financial demands, writing and cross-depositing numerous checks among eleven of his NationsBank accounts. In addition, Mr. Swanson purchased cashier's checks from NationsBank nearly every day. Each time Mr. Swanson requested a cashier's check, the bank teller would determine whether the account on which the check would be drawn contained sufficient collected funds. The bank teller

4

testified that normally they did not. Thus, the teller was required to seek the approval of a bank officer before she issued the cashier's check to Mr. Swanson. The bank officers routinely approved such cashier's checks.

On July 16, 1999, a computer operation of NationsBank in Florida informed the Wichita branch that they believed that Mr. Swanson was running a "check kite"[1] due to his pattern of writing checks. That same day, Tom McGrath, one of the NationsBank Wichita officers, caused all of Mr. Swanson's accounts to be changed from "pay all" to an immediate charge, creating an overdraft of $522,064.30. Mr. McGrath notified Mr. Swanson of this overdraft, and they discussed converting the overdraft into a promissory note to be collateralized by the existing oil and gas mortgages and the stock accounts. Within two weeks of its discovery, Mr. Swanson paid the entire overdraft.

## B. Procedural Background

On March 12, 2002, Mr. Swanson was indicted on one count of violating 18

---

[1]     Check kiting occurs when accounts are maintained in different banks and checks are drawn on one account and deposited in the other when neither account has any substantial funds in it to pay the checks drawn on it. Since it takes several days to collect a check, each of the accounts will show substantial credits of uncollected checks, and those credits will continue so long as checks continue to be drawn every day in each bank and deposited in the other bank. If some checks are drawn to cash or to legitimate third parties, the checks that flow between the two banks have to be increased to maintain the kiting equilibrium.

*United States v. Cronic*, 900 F.2d 1511, 1512 n.2 (10th Cir. 1990) (internal quotation marks omitted).

5

U.S.C. §§ 1344(1) and (2), and he proceeded to a jury trial. At trial the government showed that between March 1, 1999, and June 30, 1999, Mr. Swanson wrote and made more than 787 checks and transfers drawn on one of the eleven accounts and subsequently deposited into another of the eleven accounts, causing the numerical balances in the accounts to be artificially inflated. The government also showed that Mr. Swanson obtained approximately 150 cashier's checks from NationsBank, valued at $10,371,695, which he deposited into one of the eleven checking accounts at NationsBank. The government demonstrated that at the time all of the checks were written and deposited, the checking accounts had insufficient legitimate funds to properly cover the checks when they were deposited and later presented to the drawee banks. Thus, from March 1, 1999, to June 30, 1999, Mr. Swanson deposited $73,450,244.18 into the eleven checking accounts, of which amount $71,352,184.18 resulted from the deposits of 787 kited checks and transfers and 150 cashier's checks.

The jury convicted Mr. Swanson of one count of bank fraud under 18 U.S.C. § 1344(1), which, under the Sentencing Guidelines, warrants a base offense level of 6. USSG § 2B1.1(2001). The testimony of the government's expert, FBI Special Agent Randall Wolverton, as well as the pre-sentence report, established that the amount of loss to the bank was $522,064.30, which increased Mr. Swanson's base offense level by 14 levels to 20. USSG §

2B1.1(b)(1)(H)(2001). The court also found that because Mr. Swanson's crime affected a financial institution and he derived more than $1,000,000 in gross receipts from the offense, his offense level should be increased to 24. USSG § 2B1.1(b)(12)(A)(2001). Mr. Swanson was sentenced to a prison term of 51 months.

On appeal, Mr. Swanson argues that (A) risk of loss is an element of a violation of 18 U.S.C. § 1344(1); (B) the district court erred when it denied his motion for judgment of acquittal because the government failed to establish the elements of a violation of 18 U.S.C. § 1344(1); and (C) the district court erred in its instructions to the jury regarding proof of risk of loss. In addition, Mr. Swanson argues that (D) his sentence should be reversed and remanded because the district court sentenced him in a manner which contravened the Ex Post Facto Clause of the U.S. Constitution and which was based on improper and inadequate findings; and (E) the district court erred in calculating the amount of loss by failing to make proper and adequate findings as to the amount of loss at the time of sentencing and also by failing to grant credit for immediately available collateral. We address each of Mr. Swanson's arguments below, and affirm his conviction and sentence.

## II. Mr. Swanson's Challenges to his Conviction

## A. Elements of 18 U.S.C. § 1344(1)

The federal bank fraud statute, 18 U.S.C. § 1344 reads,

> Whoever knowingly executes, or attempts to execute, a scheme or artifice – (1) to defraud a financial institution; or (2) to obtain any of the moneys, funds, credits, assets, securities, or other property owned by, or under the custody or control of, a financial institution, by means of false or fraudulent pretenses, representations, or promises; shall be fined not more than $1,000,000 or imprisoned not more than 30 years, or both.

Mr. Swanson was convicted for a violation of § 1344(1), not of § 1344(2), but we include subsection (2) to underscore a distinction that is relevant to our discussion below of the evidence required to prove a scheme to defraud. *See* Section II.B.2.

In order to establish a violation of § 1344(1), the government must show: "(1) that the defendant knowingly executed or attempted to execute a scheme or artifice to defraud a financial institution; (2) that the defendant did so with the intent to defraud the financial institution; and (3) that the financial institution was federally insured." *United States v. Hill*, 197 F.3d 436, 444 (10th Cir. 1999).

Mr. Swanson argues that in addition to these elements, the government must prove a fourth element, that the defendant "victimize[d] the bank by exposing it to an actual loss or risk of loss." Aplt's Br. at 14. In contrast, the government has asked us specifically to hold that inquiry about "risk of loss" is "merely one way of establishing intent to defraud" in bank fraud cases, citing *United States v. Hoglund*, 178 F.3d 410, 413 (6th Cir. 1999). Aple's Br. at 16.

8

An examination of our case law reveals that the "risk," "potential risk," or "risk of loss" aspect is subsumed within the first element of bank fraud under § 1344(1), "that the defendant knowingly executed or attempted to execute a scheme or artifice to defraud a financial institution." *Hill*, 197 F.3d at 444. *See United States v. Young*, 952 F.2d 1252, 1257 (10th Cir. 1991) (holding that the government's proof that "the bank was put at potential risk by the scheme to defraud" was sufficient to support a finding that the defendant knowingly executed a scheme to defraud a bank); *United States v. Sapp*, 53 F.3d 1100, 1102-03 (10th Cir. 1995) (reaffirming *Young*); *United States v. Akers*, 215 F.3d 1089, 1101 (10th Cir. 2000) (emphasizing that *Young* "did not hold . . . that potential risk of loss to the bank was a separate element that had to be alleged in the indictment"). We conclude below that the government proved that Mr. Swanson's conduct put the bank at a risk of loss equal to the sum of his bank accounts' overdrafts each day and that the jury instructions were adequate to instruct on the risk of loss issue.

**B. The Denial of Mr. Swanson's Motion for Judgment of Acquittal**

At the close of the government's case, Mr. Swanson moved for a judgment of acquittal on the grounds that the conduct the government proved at trial does not violate 18 U.S.C. § 1344(1). The court denied this motion, and Mr. Swanson, inexplicably, failed to renew it at the conclusion of the case. On appeal Mr.

Swanson asserts that the court erred in failing to grant the motion because the evidence was insufficient to support the jury verdict.

**1. Standard of Review**

Ordinarily, "a defendant who moved for a judgment of acquittal at the close of the government's case must move again for a judgment of acquittal at the close of the entire case" or the issue will be waived. *United States v. Bowie*, 892 F.2d 1494, 1496 (10th Cir. 1990). However, "if no motion for acquittal is made at the close of all evidence, we nevertheless review for plain error under FED. R. CRIM. P. 52(b). . . . [and] the standard actually applied is essentially the same as if there had been a timely motion for acquittal." *Id.* Thus, we review this "denial of a motion for judgment of acquittal de novo, viewing the evidence in the light most favorable to the government." *United States v. Austin*, 231 F.3d 1278, 1283 (10th Cir. 2000). "[R]eversal is only appropriate if no rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Id.* (internal quotation marks omitted). This "standard requires this court to review the trial record to determine if there is evidence to support the verdict." *Id.*

**2. Existence of a Scheme to Defraud**

Mr. Swanson contends that the government did not establish the existence of a scheme to defraud because the evidence failed to prove that (a) NationsBank issued the cashier's checks by relying on the falsely inflated balances, Aplt's Br.

10

at 16, and (b) "the defendant did something more than write checks on accounts with insufficient funds." Aplt's Br. at 13. We disagree with Mr. Swanson's assessment of what is required to prove a case brought under § 1344(1) and his assessment of the evidence.

### a. Falsely Inflated Balances

As to Mr. Swanson's contention that the government failed to establish that NationsBank issued the cashier's checks in reliance on the falsely inflated balances, Mr. Swanson appears to have confused the elements of § 1344(2) with those of § 1344(1). We have held that "[a]lthough largely overlapping, a scheme to defraud, and a scheme to obtain money by means of false or fraudulent pretenses, representations, or promises, are separate offenses." *United States v. Cronic*, 900 F.2d 1511, 1513 (10th Cir. 1990). Indeed,

> the plain language of 18 U.S.C. § 1344 sets forth two distinct crimes concerning federally insured financial institutions. Each crime requires a defendant first to knowingly execute a scheme or artifice. To convict a defendant of a crime under subsection (1), the government would have to prove the scheme *defrauded* the financial institution. To convict a defendant under subsection (2), the government would have to prove the scheme enabled the defendant to obtain certain property "*by means of false or fraudulent pretenses, representations or promises*."

*United States v. Bonnett*, 877 F.2d 1450, 1453-54 (10th Cir. 1989) (quoting and adding emphasis to § 1344(2)). Had Mr. Swanson been charged under subsection (2), his argument that the government was required to prove that NationsBank

11

relied on falsely inflated balances when issuing the cashier's checks may have carried more weight. However, Mr. Swanson was charged under subsection (1), which only requires the government to prove that the defendant's scheme defrauded a financial institution. *See also Cronic*, 900 F.2d at 1513-14 ("The offense of a scheme to defraud focuses on the intended end result, not on whether a false representation was necessary to effect the result. Schemes to defraud, therefore, may come within the scope of [§1344] even absent an affirmative misrepresentation.").

### b. Evidence Mr. Swanson Did Something More Than Write Checks On Accounts With Insufficient Funds

Mr. Swanson next argues that NationsBank made a conscious business decision when it allowed him to maintain overdrafts in his accounts and that the government did not establish a sufficient pattern of conduct designed to deceive. However, our cases liberally construe the bank fraud statute, *Young*, 952 F.2d at 1255-56, and we have clearly held that check kiting, or cross-depositing a series of worthless checks, constitutes a scheme to defraud under 18 U.S.C. § 1344(1). *United States v. Ratchford,* 942 F.2d 702, 704 (10th Cir. 1991) (affirming conviction under § 1344(1) for check-kiting); *Cronic*, 900 F.2d at 1514 (stating that "check-kiting constitutes a scheme to defraud" under § 1344(1)); *Bonnett*, 877 F.2d at 1454, 1455 (adopting the same). In *Ratchford*, we held that the

government proved a violation of § 1344(1) when

> [t]he government's evidence at trial showed that on the dates the checks charged in [the indictment] were written, there were insufficient funds in the respective accounts to cover the checks. . . . [and that] the covering deposits for these checks were in the form of checks written on either the account to which the original indicted check was deposited or an account of one of defendant's other companies involved in the float scheme.

942 F.2d at 704.  Accordingly, "[f]or purposes of § 1344(1), the relevant inquiry is whether defendant knowingly had insufficient funds in the accounts being utilized on the date the checks were written." *Id*.

We emphasize that this is not a case of an isolated overdraft or a few occurrences of minor overdrafts.  Instead, there were scores of transactions.  Thus, in this case, the jury could rationally find that the evidence established that Mr. Swanson strategically used the CDA to circulate the insufficient funds checks among his eleven accounts on a daily basis, in order to take advantage of the float time inherent in the banking system so that his account balances were artificially inflated.  Accordingly, we hold that there was ample evidence for a rational trier of fact to conclude that Mr. Swanson did something more than write checks on accounts with insufficient funds.

### c. Risk of Loss

Finally, Mr. Swanson contends that the government did not establish that

NationsBank was ever at a risk of loss because the bank was always fully secured by the collateral on Mr. Swanson's loans.  However, this contention improperly analogizes the assessment of loss in check-kiting cases to the assessment of loss in fraudulently obtained loan cases.  We concede that both types of cases involve violations of the bank fraud statute.  Moreover, we have held that in fraudulently obtained loan cases, "'[t]he security of [a] loan is a valid consideration in evaluating a defendant's realistic intent and the probability of inflicting the loss.'"  *United States v. Williams*, 292 F.3d 681, 686 (10th Cir. 2002) (quoting *United States v. Nichols,* 229 F.3d 975, 980 (10th Cir. 2000)).  Here, however, Mr. Swanson's check-kiting activity was independent from and unrelated to the loans he obtained from NationsBank.  We agree with the government that Mr. Swanson's argument is tantamount to a suggestion that "if an account holder has sufficient collateral at a bank, he can commit fraud against the bank so long as his activity does not exceed the value of his collateral."  Aple's Br. at 12.  *See United States v. Flowers*, 55 F.3d 218, 221 (6th Cir. 1995) ("Check kiting is more akin to theft than to fraudulently obtaining a loan.  The offender in a fraudulently induced loan transaction at least asked the bank to provide the funds and gave some kind of security in return."); *United States v. Frydenlund*, 990 F.2d 822, 825 (5th Cir. 1993) ("[C]heck kiting is not more equivalent to a fraudulent loan transaction than to simple theft . . . .  The bank . . . voluntarily places a limit on its risk when

14

it lends money, but it is at the mercy of the check kiter for the amount of loss he may cause."). We hold that the government produced sufficient evidence for a rational trier of fact to conclude that Mr. Swanson's conduct put the bank at a risk of loss equal to the sum of his bank accounts' overdrafts each day, which on the day his check writing ability was stopped, amounted to $522,064.30. Accordingly, we hold it was not error for the district court to deny Mr. Swanson's motion for judgment of acquittal.

## C. Jury Instructions

Mr. Swanson requested that the district court instruct the jury specifically that the government must prove that the bank was exposed to a risk of loss by the defendant's conduct as a separate and distinct element of bank fraud. The district court overruled this request, finding that the risk of loss issue was adequately covered in its other instructions. The district court subsequently offered to give an instruction setting out the risk of loss language requested by Mr. Swanson. However, the district court stated that it would also instruct the jury, pursuant to the government's request, that it was not necessary to find an actual loss or that the bank sustained a loss. Mr. Swanson stated that he would prefer to leave the instructions the way they were – with both parties' specific requests being omitted from the instructions. On appeal, Mr. Swanson reiterates his objection to the jury instructions, claiming that they were legally deficient in that they "failed to

require proof that the bank was actually victimized by incurring a loss or risk of loss attributable to the Defendant's conduct." Aplt's Br. at 18.

## 1. Standard of Review

"We review the district court's decision to give a particular jury instruction for abuse of discretion and consider the instructions as a whole de novo to determine whether they accurately informed the jury of the governing law." *United States v. McPhilomy*, 270 F.3d 1302, 1310 (10th Cir. 2001).

## 2. Analysis:

The district court instructed the jury as follows:

### INSTRUCTION NO. 16

The Indictment in this case charges. . . . [that] this scheme and artifice resulted in an actual loss to Nationsbank [sic] of approximately $522,064.30 and a daily risk of loss based on the amount of the overdrafts outstanding for each day.

Aple's Supl. App. vol. I at 33, 37.

### INSTRUCTION NO. 18

Before the defendant may be found guilty of the offense charged in count 1 of the indictment, the government must prove the following essential elements beyond a reasonable doubt:

First: That the defendant Timothy J. Swanson knowingly executed or attempted to execute a scheme or artifice to defraud a financial institution as alleged in Count 1;

Second: That the defendant did so with intent to defraud; and

Third: That the financial institution was then insured by the

16

Federal Deposit Insurance Corporation.

> *As used here, a "scheme or artifice to defraud a financial institution" and an "intent to defraud" means any deliberate plan of action or course of conduct by which someone intends to deceive or cheat that financial institution and to obtain something of value, such as money, from the financial institution.*
>
> It is not necessary that the government prove each and every one of the details in the indictment concerning the precise nature of the alleged scheme, or that the alleged scheme actually succeeded in defrauding someone. The government must show, however, that the defendant knowingly executed or attempted to execute a scheme that was substantially similar to the scheme alleged in the indictment.

*Id*. at 40-41 (emphasis added). Mr. Swanson's requested instruction would have added the phrase "with intent to victimize the bank by exposing it to an actual or potential loss" following the phrase "such as money"in the fifth paragraph of Instruction No. 18. Aplt's App. vol. III, at 793.

We have already determined that the "risk of loss" aspect is subsumed within the first element of bank fraud under § 1344(1), and we agree with the district court that its instruction adequately encompassed the issue. Instruction No. 18 requires the jury to find that the government proved a scheme substantially similar to the one alleged in the indictment, and Instruction No. 16 makes it clear that the indictment charges an actual loss and a risk of loss. *See* Aple's Supl. App. vol. I, at 14 ¶ 5 (Indictment). Moreover, requiring the jury to find that Mr. Swanson "deceive[d] or cheate[d] [the] financial institution to obtain something of value, such as money, from the financial institution," *see id.* at 40 (Instr. No.

17

18), necessarily implies a finding of risk of loss. Indeed, the very point in criminalizing check kiting is that each deposit of a false check places the bank at a risk of loss, causing a significant portion of the testimony in such a case to focus on exactly how such a scheme creates the risk. *See United States v. Hickman*, 331 F.3d 439, 446 (5th Cir. 2003) (reiterating the holding in *United States v. Hord*, 6 F.3d 276, 281 (5th Cir. 1993), that each deposit of a false check puts the bank at risk of loss).

Because the instructions that the district court gave the jury were sufficient to advise it on the risk of loss issue, it was not an abuse of discretion for the trial judge to refuse Mr. Swanson's requested language. Moreover, we hold that the jury instructions as a whole accurately informed the jury of the governing law.

### III. Mr. Swanson's Challenges to his Sentence

Mr. Swanson maintains that the sentencing court erred (1) by applying the 2001 Sentencing Guidelines to him, in contravention of the Ex Post Facto Clause of the U.S. Constitution; (2) by basing the finding that Mr. Swanson received more than $1,000,000 in gross receipts on improper and inadequate findings; (3) by failing to make proper and adequate findings as to the amount of loss; and (4) by failing to grant credit for immediately available collateral in the loss calculation. We address each of Mr. Swanson's contentions and find no error in

18

his sentencing.

## A. Standard of Review

"We review de novo questions of law regarding application of the sentencing guidelines, and review for clear error the district court's factual findings." *United States v. Spencer*, 178 F.3d 1365, 1367 (10th Cir. 1999). "We will not disturb the court's factual findings unless they are without support in the record, or unless after reviewing all the evidence we are left with the definite and firm conviction that a mistake has been made." *United States v. Burridge*, 191 F.3d 1297, 1301 (10th Cir. 1999) (internal quotation marks omitted); *see also* 18 U.S.C. § 3742(e).

## B. Application of the 2001 Sentencing Guidelines

Mr. Swanson contends that the district court erred when it applied the 2001 Sentencing Guidelines to him because the 2001 amendment to the applicable guideline[2] disadvantaged him by increasing the punishment for his crime above the punishment imposed by the 1998 version, which was in effect at the time of his offense. Thus, Mr. Swanson argues that the application of the 2001 Guidelines violates the Ex Post Facto Clause of the U.S. Constitution. In

---

[2] Under the 1998 Guidelines, the applicable provision was numbered § 2F1.1(b)(7)(B). It was subsequently renumbered to § 2F1.1(b)(8)(B) without amendment to its content. Under the 2001 Guidelines, the amended provision appears at § 2B1.1(b)(12)(A). The Guidelines have since been further amended, *see* § 2B1.1(2003), but we do not address the 2003 amendments in this appeal.

response to Mr. Swanson's objection to the use of the 2001 Guidelines, the district court determined that the 2001 amendment did not work a substantive change to the guideline. Aplt's App. vol. III, at 780. Accordingly, at Mr. Swanson's sentencing on January 9, 2003, the district court applied the 2001 Guidelines, which were in effect at that time.

"The sentencing court generally must apply the sentencing guidelines in effect on the date of sentencing rather than those in effect at the time of the offense." *United States v. Orr*, 68 F.3d 1247, 1252 (10th Cir. 1995); USSG § 1B1.11(a)(2001). "The Ex Post Facto Clause, however, prohibits retroactive application of an amended guideline provision if the amendment disadvantages the defendant" by inflicting a greater punishment for an offense than the law allowed when the offense was committed. *Orr*, 68 F.3d at 1252 (internal quotation marks omitted). "If the court determines that use of the Guidelines Manual in effect on the date [of sentencing] would violate the ex post facto clause . . . , the court shall use the Guidelines Manual in effect on the date that the offense of conviction was committed." USSG § 1B1.11(b)(1)(2001).

The 1998 Sentencing Guidelines Manual directs the sentencing court to increase the offense level by four levels "[i]f the offense . . . affected a financial institution and the defendant derived more than $1,000,000 in gross receipts *from the offense*." USSG § 2F1.1(b)(7)(B)(1998) (emphasis added). Thus, the

20

guideline required that "the defendant must derive a million dollars *from the offense*, not from the financial institutions." *United States v. Monus*, 128 F.3d 376, 397 (6th Cir. 1997) (applying USSG § 2F1.1(b)(6)(B), which differs from § 2F1.1(b)(7)(B) in numbering only) (emphasis added).

In contrast, the 2001 Sentencing Guidelines Manual states

> If –
> (A) the defendant derived more than $1,000,000 in gross receipts *from one or more financial institutions* as a result of the offense, increase by 2 levels; . . . *or*
> If the resulting offense level determined under subdivision (A) . . . is less than 24, increase to level 24.

USSG § 2B1.1(b)(12)(A)(2001) (emphasis added). This amended guideline requires that $1,000,000 in gross receipts be derived from a financial institution alone, not merely from the offense.

We agree with Mr. Swanson that the 2001 amendment worked a substantive change to this guideline. Indeed, "[t]he amendment . . . substantively changes the requirements for applying the guideline by focusing on the amount derived from the financial institutions rather than the amount derived from the offense as a whole." *United States v. Hartz*, 296 F.3d 595, 599 (7th Cir. 2002) (reasoning that "[t]he Sentencing Commission . . . did not characterize the amendment as a clarification but rather as a modification and revision," and that "the amendment changed the plain language of the guideline"). Therefore, it was error for the district court to apply the 2001 Guidelines to Mr. Swanson.

21

However, because the application of either the 1998 or the 2001 version results in the identical offense level calculation, this error is harmless and does not require a remand. The 1998 Guideline instructs the sentencing court to add four levels to a defendant's offense level for violations involving $1,000,000 in gross receipts. USSG § 2F1.1(b)(7)(B)(1998). The 2001 Guideline adds only two levels but also requires that "[i]f the resulting offense level determined under subdivision (A) . . . is less than 24, increase to level 24." USSG § 2B1.1(b)(12)(A)(2001). Mr. Swanson's base offense level for violating 18 U.S.C. § 1344(1) was 6. USSG § 2B1.1(a)(2001). Because the amount of loss to the bank was between $400,000 and $1 million, his base offense level was increased by 14 levels to 20. USSG § 2B1.1(b)(1)(2001). The district court found that Mr. Swanson derived more than $1,000,000 in gross receipts from NationsBank, a financial institution. Under the 1998 Guidelines, this finding would increase his offense level another four levels, to 24. USSG § 2F1.1(b)(8)(1998). Under the 2001 Guidelines, this finding would increase his offense level by two levels, to 22, but because this level is less than 24, the court was required to increase it to 24. USSG § 2B1.1(b)(12)(A)(2001). Therefore, because the calculation of Mr. Swanson's sentence resulted in the same offense level under either set of guidelines, the district court's application of the 2001 Sentencing Guidelines did not constitute reversible error. *See United States v. Owens*, 70 F.3d 1118, 1130

22

(10th Cir. 1995) (holding error to be harmless where "under both the version of [the guideline] in effect at the time of the offense and the version in effect at the time of sentencing, [defendant's] offense level would be the same").

## C. Gross Receipts

Mr. Swanson claims that the sentencing court committed clear error by finding that he "derived more than $1,000,000 in gross receipts from one or more financial institutions as a result of the offense." USSG § 2B1.1(b)(12)(A)(2001). Application Note 9 to this guideline states that "gross receipts" include "all property, real or personal, tangible or intangible, which is obtained directly or indirectly as a result of the offense."

At trial, the government presented evidence that Mr. Swanson used the check-kiting scheme to purchase $10.4 million in cashier's checks from NationsBank. As Mr. Swanson conceded, these financial instruments were the same as cash in his hands, which he used to continue his day-trading activities. Mr. Swanson controlled the accounts that he deposited the cashier's checks into, and he directed how the funds would be used, allowing him to benefit directly and indirectly from the receipt of these cash substitutes. In addition, there was evidence that on June 30, 1999, Mr. Swanson "bled the kite" in excess of $1 million, meaning that the combined negative balances on his accounts for a particular day were in excess of $1 million. Aple's Supl. App. vol. II, at 582. On

23

this particular day, Mr. Swanson had unauthorized control of the use of more than $1 million of the bank's money. Mr. Swanson's ability to control the bank's funds allowed him to derive benefit from more than $1,000,000 in gross receipts from a financial institution. *See United States v. Bennett*, 161 F.3d 171, 192-93 (3d Cir. 1998) (upholding the enhancement for a defendant who transferred the money to businesses in which he possessed a one hundred percent interest); *United States v. Kohli*, 110 F.3d 1475, 1477-78 (9th Cir. 1997) (holding that "gross proceeds" includes "funds controlled by the defendant"). Thus, his sentence was properly enhanced under USSG § 2B1.1(b)(12)(2001).

## D. Findings as to the Amount of Loss

Mr. Swanson next contends that the district court did not adequately explain how it arrived at the amount of loss for sentencing purposes. He bases this contention on the court's statement in the sentencing memorandum and order that "the *actual intended* loss in this case is $522,064.30." Aplt's App. vol. III, at 781. While we acknowledge that the district court's language could be construed to be contradictory, the district court's statement does not render its findings clearly erroneous. The government need only establish the amount of loss by a preponderance of the evidence. *United States v. Schild*, 269 F.3d 1198, 1200 (10th Cir. 2001). "To prove intended loss, the government must show that the defendant realistically intended a particular loss, or that a loss in that amount was

24

probable." *Id.* (internal citations and quotation marks omitted).

Application note 2 to USSG § 2B1.1(2001) distinguishes between "actual loss" and "intended loss" by stating that in a determination of loss under this guideline, "loss is the greater of actual loss or intended loss." USSG § 2B1.1 cmt. n.2 (2001). We use the intended loss figure "even if it is significantly greater than actual loss . . . to measure the magnitude of the crime at the time it was committed." *United States v. Nichols*, 229 F.3d 975, 979 (10th Cir. 2000).

The pre-sentence report found that the actual loss to the bank was zero and the intended loss was $522,064.30. Aplt's App. vol. III, at 767. During the sentencing hearing, the district court expressly rejected Mr. Swanson's contention that the intended loss was zero, Aple's Supl. App. vol. II, at 589, and at the conclusion of the sentencing hearing, the district court expressly adopted the presentence report. *Id*. at 597. Thus, the meaning of the district court is clear, and we hold its findings as to the amount of loss to be adequate.

**E. Calculation of Loss**

Mr. Swanson argues that (1) the bank suffered no actual loss as a result of his check-kiting scheme because he fully repaid the $522,000 overdraft within a short time after it was discovered by the Bank, and (2) any overdrafts were secured by collateral he had previously pledged to the bank on various loans, such that there was no intended loss to the bank. Both of these claims are without

25

merit.

**1. Repaid Monies**

As to Mr. Swanson's first argument, the only credit against loss allowed by the sentencing guidelines is "money returned to the victim *before* the offense was detected." USSG § 2B1.1, cmt. n.2(E)(2001) (emphasis added). We have held there is no credit against a loss when payments are made after the detection of the offense. *United States v. Janusz,* 135 F.3d 1319, 1324 (10th Cir. 1998). The purpose of the loss calculation under the Sentencing Guidelines is "to measure the magnitude of the crime at the time it was committed. The fact that a victim has recovered part of its loss after discovery of a fraud does not diminish a defendant's culpability for purposes of sentencing." *Nichols*, 229 F.3d at 979; *see United States v. Mau*, 45 F.3d 212, 216 (7th Cir. 1995) ("The time to determine the loss in a check-kiting scheme is the moment the loss is detected . . . . The fact that a check kiter enters into a repayment scheme after the loss has been discovered does not change the fact of the loss."). Therefore, Mr. Swanson's payment of the overdraft subsequent to its detection is irrelevant to the calculation of loss. Mr. Swanson was properly sentenced based on the magnitude of his crime, which the district court measured by the size of his negative balance on the date of discovery of the fraud, $522,064.30.

**2. Collateral that "Secured" the Overdraft**

In Mr. Swanson's final argument, he claims that any overdrafts on his accounts were secured by collateral he had previously pledged to the bank on various loans, such that there was no intended loss to the bank. However, he again improperly analogizes check-kiting cases to fraudulent loan cases, in which "the loss is the amount of the loan not repaid at the time the offense is discovered, reduced by the amount the lending institution has recovered (or can expect to recover) from any assets pledged to secure the loan." *Schild*, 269 F.3d at 1200. In our discussion above, we rejected this analogy, citing *Flowers*, 55 F.3d at 221 ("Check kiting is more akin to theft than to fraudulently obtaining a loan. The offender in a fraudulently induced loan transaction at least asked the bank to provide the funds and gave some kind of security in return.") and *Frydenlund*, 990 F.2d at 825 ("[C]heck kiting is not more equivalent to a fraudulent loan transaction than to simple theft . . . . The bank . . . voluntarily places a limit on its risk when it lends money, but it is at the mercy of the check kiter for the amount of loss he may cause."). Therefore, there was no error in the district court's calculation of the loss at the time the offense was discovered.

## IV. Conclusion

For the foregoing reasons, we hold that Mr. Swanson's conviction and sentence are AFFIRMED.